### Richard ALEGRIA

v.

### Timothy R.E. KEENEY in His Capacity as Director of the Department of Environmental Management et al.[1]

No. 95–45–APPEAL.

Supreme Court of Rhode Island.

Jan. 29, 1997.

---

1. Louise Durfee was the director at the time this action was initiated. Because she no longer serves in that capacity, the title has been amended to reflect that fact.

John B. Webster, Warwick, William Mark Russo, Providence, for Plaintiff.

Gary Powers, Deputy Chief Legal Counsel, Dept. of Environmental Management, Michael Rubin, Asst. Attorney General, for Defendant.

## OPINION

LEDERBERG, Justice.

Does the denial of an application to alter wetlands constitute a regulatory taking that requires just compensation? The plaintiff in this case, Richard Alegria, purchased property that he knew contained wetlands subject to regulation under the Freshwater Wetlands Act (Wetlands Act). After his application to develop the property was denied by the Rhode Island Department of Environmental Management (DEM), the plaintiff brought a claim for inverse condemnation in Superior Court. The trial justice dismissed the action, finding that the plaintiff had knowingly assumed the risk that his project would not win approval, and the plaintiff appealed to this Court. For the reasons that follow, we affirm the judgment of the trial justice.

### Facts and Procedural History

In February 1988, plaintiff purchased a twenty-eight-acre tract of land in Warren, Rhode Island, for $500,000, aware that a substantial portion of the property was considered wetlands subject to regulation under the Wetlands Act. G.L.1956 §§ 2–1–18 through 2–1–27. In fact, DEM determined that approximately eighty percent of the property was classified as wetlands under state law. The plaintiff believed that development of the property was nonetheless possible, in part because certain surrounding properties had already been developed. The property itself fronted on a major highway and included a sewer line and its laterals already built onto the property for future development and access to three-phase electrical power suitable for manufacturing or industrial purposes. The front portion of the property facing the highway was zoned for manufacturing, and the remaining portion in the rear was zoned as residential.

In September 1988, plaintiff filed an application with DEM to alter twenty acres of the property by constructing five manufacturing/industrial buildings and four single-family residences. The plaintiff withdrew the application after he received a letter from DEM stating that the application would probably not be approved. On June 30, 1989, plaintiff submitted a revised application (application)

to alter eight acres in order to construct four manufacturing/industrial buildings and no residences.

This application was formally denied in a letter dated March 13, 1990, in which DEM stated that the proposed alteration would "cause undesirable destruction of freshwater wetlands," "result in loss, encroachment and permanent alteration of wetland wildlife habitat," "reduce the value of a 'Valuable' Wetland recreational environment," and "cause degradation of water quality within the subject wetlands complex." The letter concluded that the proposal was inconsistent with the public interest and public policy as defined in §§ 2-1-18 and 2-1-19 of the Wetlands Act. The letter noted that during the public-notice period five objections to the proposal had been received, including objections from the Warren Town Council, the Warren Conservation Commission, and the Audubon Society. The letter also pointed out that § 2-1-21(a) of the Wetlands Act, which provides that "[a]pproval shall not be granted if the city council or town council of the town within whose borders the project lies shall have disapproved within the forty-five (45) days period provided for objections," precluded DEM from granting approval because the Warren Town Council had objected to the project.

The plaintiff administratively appealed the denial of the application. On February 27, 1991, a DEM hearing officer issued a lengthy opinion denying the appeal. The plaintiff then appealed to the Superior Court, which dismissed the appeal on August 4, 1993, and affirmed the DEM ruling. The Superior Court stated that the takings issue was not properly before it and permitted plaintiff to file an amended appeal seeking compensation for the taking of his property.

A jury-waived trial was held on plaintiff's amended appeal over three days in September and October of 1994. The plaintiff testified that after the application had been denied, he consulted with engineers and determined that no economically viable use of the land remained. He further testified that any alternative plan requiring even less development could not avoid altering wetlands that lay close to the road. An appraisal expert called by plaintiff testified that the property at the time the permit was denied would have been worth $650,000 if fully developable but was worth only $34,000 in its natural state. The latter figure represented the appraiser's assessment of the amount an organization such as the Nature Conservancy might pay for the property as wetlands. The appraiser also testified that development of the property with one manufacturing/industrial building "results in estimated market value of twenty-five hundred [sic] dollars. A two building scenario results in a scenario of one hundred fifteen thousand dollars. And, a three building, two hundred sixty thousand dollars." The DEM took the position that plaintiff could not allege his circumstance constituted a taking because he had only suffered the denial of a single application to develop the property. The DEM implied both in memoranda in the record and at oral argument, that this single denial did not preclude the submission of a scaled-back plan that might gain approval.

On October 3, 1994, the trial justice dismissed plaintiff's case pursuant to Rule 41(b)(2) of the Superior Court Rules of Civil Procedure. The trial justice found that plaintiff knew of the presence of wetlands on the property prior to his purchase but nevertheless elected to make that purchase. The trial justice also found that plaintiff could have delayed the purchase until a detailed study of the property had been completed or he could have protected himself by including a contingency clause in the contract of sale, but plaintiff failed to do either. The trial justice determined that because of these circumstances, plaintiff was not entitled to compensation for what amounted to an error of judgment. The plaintiff appealed to this Court.

### Plaintiff's Takings Claim

The starting point for the analysis of a takings claim is the Fifth Amendment to the United States Constitution, which provides in pertinent part that private property shall not be taken for public use, without just compensation. In his discussion of a takings claim resulting from regulations that constrain the

use of property, as opposed to outright physical appropriation, Justice Holmes stated that "[t]he general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922). Although courts have not devised an easy litmus test to ascertain when a regulation goes "too far," the underlying rationale for such a rule remains sound: "deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." *Bowles v. United States*, 31 Fed.Cl. 37, 44 (1994). A regulatory taking may result from "a radical curtailment of a landowner's freedom to make use of his or her land; that is, by regulatory action which is neither a physical invasion nor a physical restraint." 26 Am.Jur.2d *Eminent Domain* § 10 at 453 (1996).

■ The Rhode Island Constitution also requires just compensation when private property is taken for public purposes. Article I, section 16, of the Rhode Island Constitution, provides:

"Private property shall not be taken for public uses, without just compensation. The powers of the state and of its municipalities to regulate and control the use of land and waters in the furtherance of the preservation, regeneration, and restoration of the natural environment, and in furtherance of the protection of the rights of the people to enjoy and freely exercise the rights of fishery and the privileges of the shore * * * shall be an exercise of the police powers of the state, shall be liberally construed, and shall not be deemed to be a public use of private property."

We note that the second sentence of this section, although firmly evincing a strong Rhode Island policy favoring the preservation and the welfare of the environment, cannot be interpreted by this Court to defeat the mandates of the Federal Constitution.

The United States Supreme Court has stated that land-use regulation violates the Fifth Amendment's prohibition against uncompensated taking when it "does not substantially advance legitimate state interests * * * or denies an owner economically viable use of his land." *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980); *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1016, 112 S.Ct. 2886, 2894, 120 L.Ed.2d 798, 813 (1992). In *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court identified three factors as having particular significance in the analysis of whether a taking has occurred: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Id.* at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. The Court applied these factors to New York City's denial of Penn Central's application to construct a high-rise office building above Grand Central Station, which New York City classified as a historic landmark. The Court concluded that a taking for public use had not occurred.

The Court observed in *Penn Central* that it had generally avoided any "set formula" for determining whether a taking had occurred, preferring instead to rely on "essentially ad hoc, factual inquiries." 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. In *Lucas v. South Carolina Coastal Council*, however, the Court noted that there are "at least two discrete categories of regulatory action [that are] compensable without case-specific inquiry into the public interest advanced in support of the restraint." 505 U.S. at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812. These situations meriting categorical treatment include "regulations that compel the property owner to suffer a physical 'invasion' of his property" and regulations that "den[y] all economically beneficial or productive use of land." *Id.* at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812–13.

In addressing regulatory takings, the Supreme Court in *Lucas* was particularly troubled by "regulations that leave the owner of land without economically beneficial or productive options for its use—typically * * * by requiring land to be left substantially in its natural state," because such regulations "carry with them a heightened risk that pri-

vate property is being pressed into some form of public service under the guise of mitigating serious public harm." *Id.* at 1018, 112 S.Ct. at 2894–95, 120 L.Ed.2d at 814. The Court's remedy was to provide for automatic compensation for such "total" takings, unless the prohibition on the use of the land was grounded in already existing "background principles of the State's law of property and nuisance." *Id.* at 1029, 112 S.Ct. at 2900, 120 L.Ed.2d at 821.

■ The plaintiff in the instant case attempted to bring his takings claim under the rubric of *Lucas* by characterizing the prohibition upon his development of the land as total. We are of the opinion that the record fails to support this position. The record does reveal that plaintiff filed one application to develop the property, withdrew it upon learning that it would probably not be approved, and then submitted a second, less-ambitious proposal that was ultimately denied. Although plaintiff testified that DEM's denial of his application essentially deprived the property of any economic value, such an analysis was apparently derived from plaintiff's assumption that further proposals would be rejected by DEM.

■ Specifically, plaintiff justified his failure to pursue further applications on the basis that any development plan would require altering wetlands and that any such alteration would be rejected by DEM. It is important to note that plaintiff did not allege that all other plans would lack economic value. Indeed, plaintiff's own appraisal expert testified that the land would be valued at $260,000 if it were developed with three manufacturing/industrial buildings and $115,000 with two buildings. These values, although representing a negative return on plaintiff's initial investment, cannot be characterized as noneconomic for purposes of takings analysis. This Court has held "that pecuniary loss or diminution in value is not controlling on the issue of confiscation because a property owner does not have a vested property right in maximizing the value of his property." *Annicelli v. Town of South Kingstown,* 463 A.2d 133, 140 (R.I.1983). The mere fact that plaintiff may not have received the anticipated return on his investment does not render

nugatory the remaining value of the land. *See id.*

In the absence of proof of a total taking, we turn to the three-part analysis outlined in *Penn Central.* The first factor to be considered under *Penn Central* is "[t]he economic impact of the regulation on the claimant." *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. As we noted *ante,* the regulation in this case prevented plaintiff from pursuing what he deemed to be the most profitable uses of his land. In the absence of evidence that further applications would have been futile, we are of the opinion that plaintiff may not be reimbursed for economic loss on the basis of his speculation that all productive use of the land would have been forbidden if he had made further application to DEM. We are thus left to conclude that plaintiff has suffered the denial of a particular development proposal and that any diminution in the value of his property resulting from this denial did not in itself rise to the level of interference with a vested property right. *See Annicelli,* 463 A.2d at 140.

■ The second factor identified in *Penn Central* was "the extent to which the regulation has interfered with distinct investment-backed expectations." 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. The plaintiff has forcefully argued that a claimant's notice of applicable regulations prior to purchasing land is irrelevant to the question of whether a taking has occurred. This argument, however, is evidently predicated on a total-taking claim under *Lucas* because plaintiff acknowledged in a footnote in his brief that the landowner's "knowledge is relevant to the inquiry of whether he maintained *reasonable* investment backed expectations in accordance with *Penn Central's* * * * analysis." We agree with plaintiff that prior knowledge of applicable regulations is relevant in determining whether a claimant's investment-backed expectations were reasonable under the *Penn Central* analysis. In this case, plaintiff purchased the property knowing that its wetlands were subject to regulations. Therefore, we are led to conclude that plaintiff accepted the risk that the development plans he preferred would be

disapproved. Although his investment-backed expectation to eventually develop the property in some manner may have been reasonable, plaintiff has not yet been prohibited from pursuing alternative proposals. Any investment-backed expectation to develop the property as though wetlands were not present, however, was unreasonable in light of this state's pervasive wetlands regulations.

Finally, we turn to the third factor identified in *Penn Central*, "the character of the governmental action." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. The government in this case has neither compelled "the property owner to suffer a physical 'invasion' of his property" nor denied "all economically beneficial or productive use of land," two takings situations that the United States Supreme Court has found to carry special constitutional significance. *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812–13. Rather, the government has promulgated regulations designed to preserve areas designated by statute to hold special value. *See* G.L.1956 § 2–1–18 ("swamps, marshes and other fresh water wetlands are among the most valuable of all wildlife habitats and are high value recreational areas as well"). The plaintiff has not argued in this appeal that the government's purposes in applying special regulations to protect freshwater wetlands are illegitimate, *see Agins*, 447 U.S. at 261, 100 S.Ct. at 2141, 65 L.Ed.2d at 112, or that the regulations themselves were improperly adopted, mistakenly applied to his property, or otherwise invalid for any reason other than his taking claim. In fact plaintiff stipulated in the administrative proceedings that his property contained "valuable" wetlands as defined by applicable regulations. In these circumstances, we do not view the character of the governmental action as militating in favor of a finding that a taking has occurred.

Therefore, on the basis of our review of the relevant factors identified in *Penn Cen-*

*tral*, we conclude that plaintiff's claim for inverse condemnation must fail.

### Raising of the "Notice" Defense

The plaintiff has also maintained that the trial justice erred by *sua sponte* raising as an affirmative defense to his inverse-condemnation claim the fact that plaintiff had notice of the wetlands. *See Grant v. Briskin*, 603 A.2d 324, 327 (R.I.1992) ("trial justice may not raise an affirmative defense for a defending party"). Whether or not it would have been appropriate for the trial justice to inquire upon his own initiative about plaintiff's awareness prior to purchase that the property contained wetlands, the record establishes unequivocally that plaintiff, not the trial justice, first raised this issue. Toward the beginning of plaintiff's counsel's direct examination of plaintiff, counsel inquired whether plaintiff had ever held public office. In response to the trial justice's question in regard to the relevancy of this inquiry, plaintiff's counsel responded:

> "I say it's relevant because one of the issues that is going to come up before this trial is Mr. Alegria's knowledge of the limitations contained in the Freshwater Wetlands Act which was enacted in 1971, applicable in 1974, which many, many revisions over the years, many, many problems with the statute that have come up over the years, many of which were before Mr. Alegria when he was at the State House. I want to prove to the Court that he was aware of the Freshwater Wetlands Act. He knew some problems inherent in the Freshwater Act, that notwithstanding, still had reasonable investment back[ed] expectation in being able to develop this property in light of the prohibitions contained in the Act."

The record, then, has established that the plaintiff was aware of potential wetlands problems with the property, his counsel having raised the issue during the plaintiff's testimony at trial. Moreover, this testimony was relevant to a key issue on which the plaintiff bore the burden of proof: "the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124, 98

S.Ct. at 2659, 57 L.Ed.2d at 648. Therefore, we reject the plaintiff's claim of error on this issue.

In summary, therefore, we deny and dismiss the plaintiff's appeal and affirm the judgment of the Superior Court, to which we return the papers in the case.