DECISION
Before the Court is the plaintiff's, Anthony Palazzolo ("plaintiff"), claim that the Coastal Resources Management Council's ("CRMC") denial of his application to fill approximately 18 acres of wetlands off Atlantic Avenue in Westerly, Rhode Island, constitutes an inverse condemnation taking. Specifically, the plaintiff contends that the CRMC's actions violated the Fifth Amendment's just compensation clause as incorporated by the Due Process Clause of the Fourteenth Amendment and violated Article I § 16 of the Constitution adopted December 4, 1986. Jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 FACTS and TRAVEL
The subject property consists of approximately 74 lots and is located adjacent to Winnapaug Pond in Westerly, Rhode Island. On December 1, 1959, the plaintiff purchased an undivided one-half interest in the majority of the subject property from Natale Louis and Elizabeth D. Urso ("Ursos") for approximately $8,000. (Plaintiff's Exhibit 1.) On December 2, 1959, the plaintiff and the Ursos transferred the same property to Shore Gardens Inc. (SGI), a Rhode Island Corporation. (Plaintiff's Exhibit 1.) The plaintiff was president of SGI from July 29, 1959, the date of incorporation, until February 27, 1978, when SGI's Charter was revoked. On May 15, 1969, SGI acquired, by Warranty Deed, the remainder of the subject property for a purchase price of approximately $5,000. (Plaintiff's Exhibit 2.) Between 1959 and 1961, SGI sold six parcels to various parties who constructed homes on them. (Defendants' Exhibit OO-TT.) On March 29, 1962, the plaintiff submitted an application to the State of Rhode Island Department of Natural Resources, Division of Harbors and Rivers (DHR) to dredge Winnapaug Pond and to use the dredge to fill marsh on the subject property to make it "adaptable for useful development." (Plaintiff's Exhibit 14, Decision of the Chief of the DHR at 1.) The application was returned to the plaintiff because it was missing essential information. On May 16, 1963, the plaintiff submitted a second application to DHR seeking state approval to build a bulkhead on the subject property, to dredge Winnapaug Pond, and to use the material as fill on the subject property. On April 29, 1966, the plaintiff submitted (without prejudice) a third application to DHR in which the plaintiff proposed to dredge Winnapaug Pond and dispose of the dredged material in tidal marshlands located on the subject property in order to construct a recreational beach facility. On April 1, 1971, the DHR issued a decision approving the plaintiff's applications and giving the plaintiff the option to elect either the plan to construct a bulkhead and fill the salt marsh or the plan to construct a recreational beach facility and fill the salt marsh. On November 17, 1971, the DHR revoked its assent. The plaintiff did not appeal.
In 1971 the CRMC succeeded the DHR as the regulator of coastal wetlands. (Testimony of Grover Fugate, R.I. Gen. Laws § 46-23-1, et seq.) In 1976 the CRMC adopted the Coastal Resources Management Plan (CRMP) which prohibited the filling of coastal wetlands without a special exception. In June 1983 the CRMP revised the CRMP to prohibit the filling, removing or grading in coastal wetlands adjacent to Type 1 and 2 waters "unless the primary purpose of the alteration is to preserve or enhance the feature as a conservation area or buffer against storms." (CRMP 300.2.B(1)) The subject property is adjacent to Type 1 waters.
In March 1983 the plaintiff filed an application with the CRMC to construct a bulkhead on the shoreline of Winnapaug Pond and to fill approximately 18 acres of salt marsh on the subject property. The 1983 application was nearly identical to the application the plaintiff submitted to DHR in 1962. The CRMC denied the plaintiff's application and he did not appeal that decision. (Plaintiff's Exhibit 14, CRMC Decision, Docket No. 83-3-55.) In January 1985 the plaintiff filed a second application with the CRMC to construct a recreational beach facility and to fill wetlands adjacent to Winnapaug Pond. (Defendants' Exhibit 1, CRMC Recommendations of Subcommittee, Docket No. 85-1-33.) The 1985 application was nearly identical to the application the plaintiff submitted to DHR in 1966. The CRMC denied the 1985 application. On June 15, 1988, the plaintiff filed the instant action alleging that the CRMC's denial of his application constituted a talking of his property without just compensation.
The plaintiff contended that SGI was not the true owner of the subject property, even though it held title to the subject property since December 2, 1959, and May 15, 1969. The plaintiff argued that he was the owner of the subject property because he had acquired 100 percent of SGI's stock in 1961. The plaintiff further argued that because a single-family dwelling or a recreational beach facility was the only permissible use for the subject property, the CRMC's approval of one of his two applications was necessary to enable him to obtain some use of his property. The plaintiff also contended that the CRMC's rejection of his 1983 and his 1985 applications constituted a taking of his property by denying him all beneficial use of his property in violation of the United States Supreme Court's decision in Lucas v. South Carolina Coastal Council,505 U.S. 1003, (1992) and the Rhode Island Supreme Court's decision inAnnicelli v. Coastal Resources Management Council, 463 A.2d 133
(R.I. 1983).
The CRMC contended that its denial of the plaintiff's application to fill approximately 18 acres of coastal wetlands was not a taking because the plaintiff failed to present a more moderate, less damaging, more environmentally-compatible alternative. Therefore, the CRMC argued, the plaintiff could not contend that he had been deprived of all beneficial use of his property. The state also asserted that the plaintiff's claim was not ripe because he had failed to specify in his application that he intended to develop a residential subdivision. Alternatively, the CRMC contended that the plaintiff could not claim that his
property was taken because SGI was the true owner of the subject property at the time of the alleged taking. In addition, the CRMC contended that even if the plaintiff had title to the subject property, he did not acquire it until 1978 when the Secretary of State revoked SGI's Certificate of Incorporation and SGI lost its corporate status. The CRMC maintained that because the plaintiff took title to the property subject to the regulations which existed in 1986, at the time of the alleged taking, the plaintiff had no expectation to develop his property in contravention of those regulations. Moreover, the state argued that even if the CRMC's regulations did deny the plaintiff loss of all beneficial use of the subject property, the state did not have to compensate the plaintiff because of the common law nuisance doctrine. The State raised numerous additional arguments including statute of limitations, the public trust doctrine, and lack of damages.
At trial, the plaintiff testified that the CRMC informed him that any proposal involving the filling of wetlands would be denied. Several witnesses testified that the site at the eastern end of Shore Gardens Road was developable. Grover Fugate, the Director of CRMC, and Steven Clarke, a professional engineer, testified that the CRMC would have approved the eastern end of Shore Gardens Road as a home site. The state's witness, Mr. Andolfo, testified that the value of the subject property located at the eastern end of Shore Gardens Road would be approximately $200,000 if developed. The plaintiff did not contradict this evidence. The plaintiff submitted an appraisal report which noted that the subject property had a value of $157,500 as an open-space gift.
 TAKINGS ANALYSIS
The takings clause of the Fifth Amendment to the United States Constitution made applicable to the states through the Fourteenth Amendment and Article I, § 16 of the Rhode Island Constitution provides that private property shall not be taken for public use without just compensation. Under these provisions, when the government's interference with an individual's private property rights reaches so far as to constitute a taking, the government must compensate the individual for the interference.Brunelle v. Town of South Kingstown, No. 95-489-A., Slip Op. at 13 (R.I. filed July 31, 1997.)
The plaintiff contends that the CRMC's actions constituted a taking under the Fifth Amendment to the United States Constitution and under Article I, § 16 of the Rhode Island Constitution. The plaintiff cites Lucas v. South Carolina CoastalCouncil, 112 S.Ct. 2882 (1992) and Annicelli v. Town of SouthKingston, 463 A.2d 133 (R.I. 1983) for the proposition that a landowner whose land is deprived of all economically viable use is entitled to compensation.
In Lucas, the landowner brought two residential lots on a South Carolina barrier island with the intention of building single-family homes. 505 U.S. 1003, 1009, 112 S.Ct. 2886, 2889. Two years later the state legislature enacted a law which barred the landowner from erecting any permanent habitable structures on the parcels. Id. The United States Supreme Court found that the ban on construction had deprived the landowner of all economically viable use of his property, and therefore, effected a taking of his property requiring the payment of just compensation unless the state could prove the plaintiff's proposal constituted a common law nuisance. 505 U.S. at 1030-1031, 112 S.Ct. at 2901-2902. The Lucas holding was limited to the "relatively rare situations" where "no productive or economically beneficial use is permitted." 112 S.Ct. 2886, 2894,505 U.S. 1016, 1018.
In Annicelli, the landowner signed a purchase-and-sales agreement to purchase real estate for the purpose of constructing a single-family dwelling. 463 A.2d 133, 135. Three weeks after the agreement was signed, the town council adopted amendments which created an HFD zone and prohibited building residential dwellings in that zone. Id. Under the amendment, Annicelli's property was in an HFD zone. Id. The Rhode Island Supreme Court noted that the evidence in the record showed that the plaintiff did not have any use of her property and that an award of compensation was appropriate. 463 A.2d at 140. (Emphasis added.) As in Lucas, the court awarded compensation because it found that the property had lost "all reasonable or beneficial use."463 A.2d 133, 141.
Under either Lucas or Annicelli, the plaintiff has the burden of proving that he had lost "all reasonable or beneficial use" of his property in order to prevail in his claim for compensation. However, the plaintiff's failure to prove that the government regulation denied him all economically beneficial use of his property does not necessarily preclude his recovery. Brunelle, Slip Op. at 13. The Brunelle court also noted a situation which "involves those instances in which governmental regulations, although not denying a property owner all economic benefit from his or her land, nonetheless substantially serve to reduce the economic value of the landowner's property." Slip Op. at 14. The Rhode Island Supreme Court noted that when the government regulation is derived from the state's general police powers, the court should examine "the economic impact of the regulation on the claimant and * * * the extent to which the regulation has interfered with distinct investment-backed expectations, to determine if compensation must be paid." Brunell, Slip Op. at 14 (quoting Lucas, 505 U.S. at 1019 n.8, 112 S.Ct. at 2895 n.8, 120 L.Ed.2d at 815 n.8 (quoting Penn Central Transportation Co.v. New York City, 438 U.S. 104 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978)).
The ownership of property creates a "bundle or rights" including the right to possession, to exclude others, to use and enjoy, and to dispose of the property. Loretto v. TeleprompterManhattan CATV Corp., 458 U.S. 419, 435 (1982). The economic impact of the regulatory scheme is determined by viewing its effect on that bundle. In Lucas, the Court noted that the state "may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." 505 U.S. at 1028, 112 S.Ct. at 2886. Moreover, under Penn Central, the court considered "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations."438 U.S. 103, 124, 98 S.Ct. 2646, 2659. The plaintiff contends that he has been the owner of the subject property since 1961. However, the evidence at trial and general corporate law principles demonstrate otherwise. On December 1, 1959, the plaintiff purchased an undivided one-half interest in the majority of the subject property. On December 2, 1959, the plaintiff and the Ursos transferred that property to SGI. Therefore, as of December 2, 1959, SGI was the title owner of the subject property until it transferred that title to a new owner. On May 15, 1969, SGI acquired Lots 3-7 of the subject property. SGI transferred title to six parcels of the subject property to various parties between 1959 and 1961 and retained title to the remainder of the subject property. In 1978, SGI's corporate status was revoked.
The plaintiff correctly states that when a private business corporation ceases to exist its property passes by operation of law to its stockholders. (Plaintiff's Brief at 21 (citingFriendly Home V. Shareholders Creditors, 474 A.2d 934 (R.I. 1984)). The plaintiff also correctly notes that when the Secretary of State revokes a corporation's charter, the corporate assets pass to the stockholders. Id. However, the plaintiff incorrectly concludes that because he was SGI's sole stockholder as of 1960, he owned SGI's assets that included the subject property. According to corporate law principles, an owner of all or a majority of the stock of a validly formed corporation does not own the property of the corporation. Rhode Island HospitalTrust Company v. Doughton, Commissioner of Revenue of NorthCarolina, 270 U.S. 69, 81, 46 S.Ct. 256, 258 (1926). This rule is based on the theory that a corporation is a separate entity from its shareholders. Vol. 12B, William Meade Fletcher, FletcherCyclopedia of the Law of Private Corporations sec. 5517 (Perm. ed. 1993). Therefore, this court finds that the plaintiff as the sole stockholder of SGI was not the owner of the subject property until 1978, when the Secretary of State revoked SGI's corporate status.
Determination of when a landowner obtains title to property in a takings case is necessary for determination of the "bundle of rights" that the landowner owned at the time of the taking. In the instant matter, the plaintiff took title to the property in 1978, which was seven years after the CRMC wetland regulations had been promulgated. Since 1971, the CRMC has had the authority to regulate coastal wetlands. Rhode Island Gen. Laws §46-23-1, et seq. In 1972, Congress enacted the Federal Coastal Zone Management Act, 16 U.S.C. § 1451, et seq., which required CRMC to implement regulations for the protection of coastal wetlands. Finally, in 1976, the CRMC adopted the Coastal Resources Management Plan which prohibits the filling of coastal wetlands without a special exception. Because the plaintiff obtained title to the subject property in 1978, and because the regulations that prohibited the filling of wetlands were in place at that time, the plaintiff cannot prevail in his claim that the CRMC's actions constituted a categorical taking of his property when it denied the plaintiff's 1985 application to fill wetlands on the subject property.
Moreover, the facts in the instant matter are clearly distinguishable from those set forth in Lucas and relied upon by the plaintiff. In Lucas, the plaintiff purchased the subject property two years before the passage of the regulations that denied him of all beneficial use of his property. 112 S.Ct. 2886, 2889, 505 U.S. 1003, 1009. In the instant matter, the regulations were in place approximately two years before the plaintiff acquired title to the property and approximately seven years before the plaintiff submitted his first application to the CRMC in 1983. Furthermore, unlike the plaintiff in Lucas, the plaintiff in the instant matter failed to prove that he was denied all beneficial use of the subject property. At trial, several witnesses testified that the site at the eastern end of Shore Gardens Road was developable. The state's witness, Mr. Adolfo, testified that, if developed, the value of the subject property on the eastern end of the Shore Gardens Road would be approximately $200,000. Grover Fugate, the director of CRMC, and Steven Clarke, a professional engineer, testified that the CRMC would have approved the site at the end of the road as a home site. In addition, as an open-space gift, the property's value would be approximately $157,500. The above evidence was uncontradicted. Our Supreme Court noted in Allegria, "the mere fact that the plaintiff may not have received the anticipated return on his investment does not render nugatory the remaining value of the land." Allegria, 687 A.2d 1249 (quoting Annicelli,463 A.2d 133, 140). Accordingly, the evidence before this Court demonstrates that the plaintiff did not lose all beneficial use of the subject property.
In addition, even assuming arguendo that the CRMC's regulations constituted a taking of the plaintiff's property, the state would not be required to compensate the plaintiff if it demonstrated that the use prohibited by the CRMC regulation constituted a public or private nuisance. Brunelle, Slip Op. at 13. The United States Supreme Court noted that its "total taking" inquiry under Lucas would include an analysis of "the degree of harm to public lands and resources, or adjacent private property, posed by the claimant's proposed activities, see, e.g., Restatement (Second) of Torts §§ 826, 827, the social value of the claimant's activities and their suitability to the locality in question . . ." Lucas 112 S.Ct. 2886, 2901, 505 U.S. 1003, 1030-31. At trial, the CRMC introduced evidence regarding the off-site impacts of the plaintiff's proposal. Cf. Ocean RoadPartners v. State, 670 A.2d 246 (1996) (rejecting argument that just compensation must include entrepreneurial profit where plaintiff had not made improvements to property at the time of taking). The CRMC introduced evidence that the filling of 18 acres of salt marsh would reduce the existing salt marsh in Winnapaug Pond by 12 percent. In addition, the evidence showed that a 12 percent reduction in the salt marsh in Winnapaug Pond would cause a reduction in the commercial and recreational shellfish and finfish populations in Rhode Island. Moreover, the evidence indicated that the 12 percent loss of the total salt marsh in the Winnapaug Pond will have a significant detrimental impact on the existing salt marsh filtering mechanisms within the pond which could be expected to result in increased harmful nitrate levels within the pond. The evidence illustrated that high levels of nitrate in groundwater poses a public health threat because ground water is the sole source of drinking water. Therefore, based on evidence of the probability of an increase in nitrate levels in Winnapaug Pond and the threat to ground water, and based on the evidence that the plaintiff's proposal would not be suitable for the locality of the subject property, this Court finds that the plaintiff's proposal would constitute a public nuisance. As a result, even were this Court to determine that the CRMC's denial of the plaintiff's application was a "total taking" under Lucas, the nuisance doctrine would prevent this Court from awarding the plaintiff compensation.
Furthermore, the plaintiff's claim must fail because he did not have any investment-backed expectations. In a factually similar case, the Rhode Island Supreme Court denied a landowner's claim for inverse condemnation against the Department of Environmental Management (DEM). In Allegria v. Keeney, the Rhode Island Supreme Court denied the plaintiff's claim that DEM's denial of his application to develop property which contained wetlands constituted a taking. 687 A.2d 1250 (1997). In denying the plaintiff's claim the Court reasoned that the plaintiff's knowledge of the applicable regulations was relevant to its inquiry into the plaintiff's investment-backed expectations. 687 A.2d at 1253. The court specifically noted that the plaintiff had not been prohibited from pursuing alternative proposals. "Any investment-backed expectation to develop the property as though wetlands were not present, however, was unreasonable in light of this state's pervasive wetlands regulations." Id. at 1254. Similarly, the plaintiff in the instant matter took title to the property in 1978 subject to the wetlands regulations so, like the plaintiff in Allegeria, he cannot claim that he had any investment-backed expectations. Moreover, the plaintiff has not been prevented nor would he be prevented from developing the property along the eastern end of Shore Gardens Road. Consequently, this Court finds that the plaintiff has not demonstrated a taking under Penn Central with respect to investment-backed expectations because he knew that the state regulated the filling of wetlands since 1965 and because he is able to pursue a smaller and more appropriate proposal to develop the subject property.
Alternatively, even if the plaintiff were title holder of the majority of the property since 1961, the plaintiff still failed to prove a takings claim. This court has held "that pecuniary loss or diminution in value is not controlling on the issue of confiscation because a property owner does not have a vested property right in maximizing the value of his property."687 A.2d 1249, 1253 (quoting Annicelli v. Town of South Kingstown,463 A.2d 133, 140). The plaintiff paid approximately $8,000 for the property acquired in 1959 and SGI paid approximately $5,000 for the property acquired in 1969. The evidence showed that SGI sold six individually buildable parcels of the property between 1959 and 1961. If this Court determined that the plaintiff owned the subject property in 1961, then it must also determine that the plaintiff, as opposed to SGI, benefitted from the parcels sold in 1961. The plaintiff cannot claim that he owned the property for one purpose and that SGI owned the property for another purpose. As a result, even if the plaintiff did not recover his initial total investment of $13,000, he did receive some economic benefit when the parcels were sold, so that his initial investment cannot be characterized as noneconomic for purposes of a takings analysis. See Allegria, 687 A.2d 1249, 1253. The plaintiff has not lost all or even a substantial use of the subject property.
Finally, the plaintiff's reliance on L.A. Ray Realty, et alv. The Town Council of the Town of Cumberland, et al., is misplaced. 698 A.2d 202 (1997). In L.A. Ray, the Court found that government officials' denial of a development project violated that plaintiff's substantive and procedural due process rights. The evidence at trial showed that the two proposals submitted to the CRMC were nearly identical to the proposals submitted to the DHR in 1962, 1963, and 1966 and rejected in 1971. The plaintiff's plans to dredge Winnapaug Pond and fill the wetlands on his property in order to develop either a large-scale subdivision or a recreational beach were both denied by DHR. The plaintiff never appealed that decision. In 1983, approximately 12 years after DHR denied the plaintiff's proposals based on regulations in place prior to 1971, the plaintiff took a second "bite at the apple" when he submitted the applications to the CRMC, the agency which succeeded DHR in regulating wetlands. The record reflects that the plaintiff has been afforded ample procedural due process.
 CONCLUSION
Accordingly, this Court denies the plaintiff's request for relief and enters judgment for the defendant State of Rhode Island. Counsel shall confer and agree upon an appropriate form of order and judgment reflective of this Court's decision and submit it to the Court forthwith for entry.