DECISION
This case is before the Court on appeal from a decision of an appeals officer of the Department of Environmental Management (DEM). The appellants, Ronald Ronci and Barbara Ronci, seek reversal of the November 22, 1993, decision which granted the appellants a permit to alter wetlands subject to special conditions. Jurisdiction is pursuant to G.L. § 42-35-15.
Facts/Travel
On September 29, 1981, the DEM issued a Cease and Desist Order to a contractor working on site at the property in question. Joint Exhibit, No. 5. The property is located north of Snake Hill Road at Pole #114, in Glocester, Rhode Island and consists of 11.8 acres of land. On October 8, 1981, the DEM issued a Notice of Violation and Order (NOV) to the appellants alleging that on September 29, 1981, they "did accomplish or permit sedimentation of and the filling and regrading in and within 100 feet of a fresh water stream, filling of an area subject to storm flowage and the regrading within 50 feet of a freshwater swamp." Joint Exhibit, No. 6.
The NOV ordered the appellants to cease and desist from any further alterations and to fully restore the altered freshwater wetlands to their state as of May 9, 1974, insofar as possible, on or before October 31, 1981. The NOV further stated that failure to request a hearing within ten days to show cause why the order should not remain in effect would result in the notice automatically becoming a compliance order. In addition, the NOV ordered that, "[i]f the restoration required . . . above is not accomplished within the reasonable time therein specified . . . the Director may, in his discretion and without further notice, order the restoration work done by an agent of his choosing, and you will be held liable for the cost of restoration."
On March 8, 1982, Mr. Ronci and the Freshwater Wetlands Section of the DEM entered into a signed Consent Agreement. JointExhibit, No. 7. According to the terms and conditions of the Consent Agreement, the parties agreed that the order contained in the NOV would remain in full effect with the following modifications:
 "1. Respondent agrees to submit an application for permission to alter fresh water wetlands along with all the necessary requirements to this Department on or before May 10, 1982.
 2. Respondent agrees to install and maintain adequate sedimentation and erosion controls on-site pending a decision on this application.
 3. This Department agrees to postpone the restoration order contained in the above-mentioned Notice of Violation pending a decision on this application."
Nine years later, on May 5, 1991, the appellants submitted an application seeking permission to alter freshwater wetlands. The application sought after-the-fact approval for the unauthorized alterations already in place on the site.
The wetlands affected by the application "consist of a swamp, with an associated 50 foot perimeter wetland (that area within 50 feet of the edge of any swamp; a river (Mosquitohawk Brook), with an associated 100 foot riverbank wetland (that area within 100 feet of the edge of a flowing body of water less than 10 feet wide during normal flow); and an area subject to storm flowage (intermittent steam) with an associated 100 foot riverbank wetland." Joint Exhibit, No. 4 at p. 2.
The proposed alterations consist of: "1) Vegetative clearing, filling, creating soil disturbance in and within 50 feet of a swamp; 2) Filling in, and diversion into a new channel, of approximately 700 linear feet of a river (Mosquitohawk Brook); 3) Filling in, and diversion of a new channel, of approximately 350 linear feet of an area subject to storm flowage; 4) Vegetative clearing, filling, grading, creating soil disturbance, and other construction disturbance within the 100 foot riverbank wetlands associated with the above-described watercourses." Id.
On May 29, 1992, the DEM issued its response to the appellants' application, stating that, "with special conditions, the project does not represent an abridgment of the Rhode Island Fresh Water Wetlands Act. Therefore, your application is herebyAPPROVED and the permit issued PROVIDED THAT you comply with the following Permit Conditions. PLEASE NOTE THAT THESE CONDITIONS MAY AND CAN SUPERSEDE PORTIONS OF THE APPROVED PLAN." JointExhibit, No. 2. The approval letter listed twenty special conditions which include:
 "11. Applicant is required to replant a minimum
40-foot wide vegetated buffer zone along the eastern side of the western-most watercourse, from the northern property bound to Snake Hill Road. The applicant must install evergreen trees in a double staggered row, said plantings to consist of 50% Eastern Hemlock (Tsuga canadensis) and 50% Northern White Cedar (Thuja occidentalis) three feet minimum in height at the time of planting and spaced at 20 feet on center. Applicant must also plant shrubs consisting of Highbush Blueberry (Vacciium corymbosum) spaced accordingly between the above-described evergreen plantings. Applicant is to strictly conform to the red-line planting schematic, provided on the approved site plans, in accomplishing these required plantings.
 13. The applicant must plant an additional single line of evergreen plantings, consisting of either Tsuga canadensis or Thuja occidentalis at a spacing of 20 feet on center, along the eastern-most watercourse.
 17. Applicant must allow that portion of the pasture, located in the extreme northwest corner of the property west of the stream, to revert naturally to a natural and undisturbed wild state and remain undisturbed as a wildlife habitat."
The appellants made a timely appeal of the approval and requested an adjudicatory hearing to challenge the inclusion of conditions with the issuance of the permit. The Administrative Adjudication Division (AAD) of the DEM held a pre-hearing conference on July 30, 1992, and held hearings on September 21 and 22, 1992.
On September 30, 1993, the AAD upheld the DEM's approval with conditions in a Recommended Decision and Order which was adopted as a Final Agency Order by the director of the DEM on October 5, 1993. Due to an error in the certification for mailing, an Amended Recommended Decision and Order was issued on November 19, 1993, which was adopted as a Final Agency Order on November 19, 1993. The appellants filed the instant appeal of the Amended Final Agency Order.
Standard of Review
The review of a decision of the Department of Environmental Management by this Court is controlled by R.I.G.L §42-35-15(g), which provides for review of a contested agency decision:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact.Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Commission's decision. Newport Shipyard v. Rhode IslandCommission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897. (Quoting Caswell v.George Sherman Sand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)). This is true even in cases where the Court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept. ofEmployment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts.Carmody v. R.I. Conflicts of Interests Commission, 509 A.2d at 458. The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public Telecommunications Authority, etal. v. Rhode Island Labor Relations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
1. Condition of the Property in 1981
On appeal, the appellants argue that because the DEM failed independently to ascertain the conditions of the site prior to the alleged violations in 1981, the DEM was thereby prevented from ordering a valid and reasonable restoration pursuant to the authority granted to the DEM by the General Assembly.
In 1971, the Legislature enacted the Rhode Island Freshwater Wetlands Act (Act) which declares that the public policy of the State is:
 "to preserve the purity and integrity of the swamps, marshes and other freshwater wetlands of this state. The health, welfare, and general well being of the general populace and the protection of life and property require that the state restrict the uses of wetlands and, therefore, in the exercise of the police power those wetlands are to be regulated hereunder." R.I.G.L. 1956 § 2-1-19.
The Act "gives the director of the DEM responsibility for identifying, protecting, and regulating development within Rhode Island's freshwater wetlands." Environmental ScientificCorporation v. Durfee, 621 A.2d 200, 203 (R.I. 1993). All powers necessary to enforce the Act are expressly vested in the [DEM] director. Citizens for Preservation of Waterman Lake v. Davis,
420 A.2d 1221, 1224 (R.I. 1985). Pursuant to § 2-1-20.1, the director promulgates rules and regulations governing enforcement of the Act. Environmental Scientific Corporation, 621 A.2d at 203. The Act intends to preserve wetlands in the state, as they existed when the Act was passed in 1971, unless permission is granted by the director to allow alterations. Wood v. Davis,488 A.2d 1221, 1224 (R.I. 1985). Section 42-17.1-2 confers various powers and duties upon the director which includes the power:
 "[t]o give notice of an alleged violation of law to the person responsible therefore whenever the director determines that there are reasonable grounds to believe that there is a violation of any provisions of law within his or her jurisdiction or of any rule or regulation adopted pursuant to authority granted to him or her. . . ." R.I.G.L. 1956 § 42-17.1-2(u).
The statute further states that "[i]f no written request is made to the director within ten (10) days of service of notice, the notice shall automatically become a compliance order." R.I.G.L. § 42-17.1-2(u)(1).
In the instant matter, the appellants object to the conditions imposed by the DEM and argue that because the DEM failed independently to ascertain the conditions of the site prior to the alleged violations in 1981, it was thereby prevented from ordering a valid and reasonable restoration pursuant to the authority granted to the DEM by the General Assembly. The appellants criticized the DEM for not producing a witness to testify what the actual conditions of the property were in 1981. The appellants are essentially arguing that failure of the DEM to know exactly what the property looked like immediately prior to and immediately after the alterations, prevents the DEM from validly ordering any reasonable restorations.
Section 42-17.1-2(u) specifically gives the director the authority to give notice of an alleged violation whenever he or she determines that there are reasonable grounds to believe thata violation has occurred. Finding a contractor on the site in the process of committing violations could certainly be considered by the hearing officer to be reasonable grounds to believe that a violation has occurred. Obviously, once violations have already occurred, it is very difficult to determine exactly what the property looked like immediately prior to the violations except through extrinsic evidence such as aerial photographs.
The DEM argues that in light of the clear mandate "to preserve wetlands in this state as they existed when the Act was passed in 1971" the Department must rely on aerial photographs taken before and after unauthorized alterations in order to determine what is necessary to reestablish prior wetland conditions. In the Spring of 1972, aerial photographs of the state were taken by the soil conservation service. State v.Capuano Brothers, 384 A.2d 610, 614 (R.I. 1978). Through a process of photo interpretation the department was able to identify freshwater wetlands and mark them on the aerial photographs. Id. At the hearing, DEM experts testified that they carefully reviewed aerial photographs of the site taken in 1970 and 1972, and observed present wildlife on site and in the surrounding area in order to ascertain the conditions of the site prior to the 1981 alterations. They testified further that they reviewed prior written reports made by other officials of the DEM as well as additional aerial photographs taken in 1985 and 1992. These aerial photographs clearly show that further alterations occurred on the site after 1981. In addition, one of the DEM experts, Mr. Ellis, testified at length as to his familiarity with the site dating back to his first site inspection in 1983. Another DEM expert, Mr. Albro, stated that the department utilizes aerial photographs "to determine the state of the area prior to the alteration . . ." and then prepares ". . . a plan of restoration" in an attempt to "recreate and reprovide wildlife habitat values" formerly associated with the altered wetlands.Hearing Transcript, September 22, 1992, p. 35-36.
Although the DEM did not present any witnesses who were at the site in 1981, the evidence presented by the DEM concerning its complete and accurate knowledge of the site's conditions prior to the alterations is very compelling, and the hearing officer was not incorrect when she found that this evidence provided support for the imposition of conditions to the applicants' permit.
2. Conditions Imposed by the Permit
The appellants argue that the imposition by the DEM of Conditions 11, 13 and 17, imposed by the DEM, are in excess of the statutory authority of the agency and that given the reliable, probative, and substantial evidence offered by the appellants at the hearing, these conditions should be removed. In addition, the appellants argue that imposition of the conditions would negatively impact the site as it presently exists.
Under the Act, "[n]o person . . . may . . . alter the character of any freshwater wetland as herein defined without first obtaining the approval of the director of the department of environmental management." R.I.G.L. § 2-1-219(a). If it is determined that an applicant's proposed land use would require alterations of freshwater wetlands that are inconsistent with the purposes of the Wetlands Act, the application for a permit is denied. Environmental Scientific Corporation, 621 A.2d at 203. The director has the authority to deny a proposed wetlands alteration if, in his or her opinion, "such alteration will cause random, unnecessary and/or undesirable destruction of freshwater wetlands," (See Rule 5.03(c) of the Wetlands Rules and Regulations) or that the "granting of approval would not be in the best public interest." R.I.G.L. § 2-1-21(a). "The burden of proof that the subject proposal is not inconsistent with the provisions of the Act and [the] rules remain[ ] with the applicant." Rule 11.02(b) of the Wetlands Rules and Regulations.
In the event of a decision in favor of granting an application, the director shall issue a permit for the applicant to proceed with the project. The permit may be issued upon such terms and conditions, including time for completion, as the director may require. R.I.G.L. § 2-1-22(d).
The section of the Act which deals with violations states:
 "In the event of a violation of § 2-1-21, the director of environmental management shall have the power to order complete restoration of the fresh water wetland area involved by the person . . . responsible for the violation. If the responsible person . . . does not complete the restoration within a reasonable time following the order of the director of the department of environmental management, the director shall have the authority to order the work done by an agent of his choosing and the person . . . responsible for the original violation shall be held liable for the cost of restoration." R.I.G.L. § 2-1-23.
A violation has been defined as a "commencement of activity before first obtaining the requisite approval of the director of DEM pursuant to § 2-1-21, or a violation of any of the director's rules and regulations." Conklin Limestone v. StateDepartment of the Environment, 489 A.2d 327, 328 n. 2 (R.I. 1985). "The Wetlands Act does not authorize any exemptions from its requirements and the necessity for obtaining a permit is clearly mandated in § 2-1-21." Id. In Wood v. Davis, our Supreme Court held, as a matter of law, that "prior approval is always required before a person can lawfully alter a wetland."Wood v. Davis, 448 A.2d at 1224 (finding, as a matter of law, that the defendants were in violation of § 2-1-21(a) because they never applied for a permit and had admittedly altered wetlands after passage of the Act). Section 2-1-24 states:
 "Whenever any person . . . shall commence any activity set forth in § 2-1-21 without first having obtained the approval of the director, or violates any rule or regulation of the director, the director shall have the power by written notice to order the violator to cease and desist immediately and/or restore the wetlands to their original state insofar as possible." R.I.G.L. § 2-1-24(a)
In the instant matter, in September, 1981, the DEM issued a Cease and Desist Order to a contractor on the site and in October, 1981, the appellants received a Notice of Violation from the DEM ordering them to restore the site to its state as of May 9, 1974. There is no evidence in the record to indicate that the director ever granted permission for alterations to the site. In addition, there is no evidence on the record that the appellants requested a show cause hearing within ten days of receiving notice; thus, the NOV automatically became a compliance order. It was not until five months after the NOV that appellant, Ronald Ronci, signed a Consent Agreement with the DEM.
The Consent Agreement specifically stated that the order contained in the NOV would remain in full effect subject to certain modifications. These modifications were that: (1) the appellant agreed to submit an application for a permit on orbefore May 10, 1982; (2) the appellant agreed to install and maintain adequate sedimentation and erosion controls pending a decision on said application; and (3) the DEM agreed to postpone
the NOV restoration order pending a decision on the application. Thus, according to the terms of the Consent Agreement and the statutory powers granted by the Legislature, the director of the DEM could have enforced the restoration order contained in the NOV upon the failure of the appellants to submit an application for a permit on or before May 10, 1982.
On May 5, 1992, almost nine years after expiration of the application period established by the Consent Agreement, the appellants finally submitted their application. The record reveals that sometime between 1983 and 1985, the appellants altered the watercourse, and that in 1987, the appellants began to raise cattle on the site. The record reveals further that if the DEM had denied the appellants' application outright, full restoration of the site would have been required. HearingTranscript, September 22, 1992, p. 22. See also Consent Agreement.
According to Mr. Cohen, a witness for the appellants, fulfillment of Conditions 11 and 13 would require the replanting of approximately 1.01 acres, or 8.5% of the entire property. This amounted to replantings of 0.88 acres for Condition 11 and 0.13 acres for Condition 13 respectively. In addition, Mr. Cohen determined that the northwest triangle set forth as Condition 17 consists of 0.75 acres. Thus, Mr. Cohen testified, imposition of the conditions would reduce the pasture area from 7.48 acres to 5.72 acres and would result in a total loss of 23.5% of grazing pasture. Hearing Transcript, September 21, 1992, p. 24, 28, 32.
A. Condition 11
The appellants argue that the testimony of one of their experts, Dr. Kupa, demonstrates that the imposition of Condition 11 would negatively impact the site. Dr. Kupa, who described the current condition of the wetland as a "wet meadow/open field," testified that the imposition of Condition 11 would eradicate the wetland plants presently existing at the site and would render the existing wetland system less valuable to wildlife than it is in its present altered state. Hearing Transcript, September 21, 1992, p. 49. In fact, Dr. Kupa testified that Condition 11 "flies in the face of protection of the wetland as it presently exists."Id. p. 50. Under cross-examination, however, Dr. Kupa admitted that he had no knowledge as to what the wetland conditions were like on the property prior to the alterations and that he had not considered what the value of those wetland areas would have been had they remained in their unaltered state. Id. at p. 73-74. In addition, Dr. Kupa failed to address any of the water quality concerns raised by the DEM.
In contrast, DEM witnesses, Mr. Horbert and Mr. Albro, testified that the rationale for imposing Condition 11 is to regain some of the value that the previously unaltered riverbank used to have in relation to the stream, in terms of both wildlife habitat and water quality attenuation. At present, the eastern side of the watercourse provides no cover for wildlife, and the required vegetation would provide a better buffer zone for wildlife which use the stream course as a traveling and migratory corridor between wetlands to the north and wetlands to the south. Additionally, it would have some use as a noise filter for sounds of the cattle and from human disturbance. Hearing Transcript,
September 21, 1992, p. 139-140, 144, 169.
Mr. Horbert, who identified the stream as a tributary to the Scituate Reservoir Watershed, testified that the plantings were expected to provide protection of the water quality of the stream in several ways: by keeping cows away from the stream, the introduction of animal effluence would be reduced; the vegetative buffer would trap and prevent sedimentation of the stream; and the shading of the stream would negate some of the warming of the stream water which it presently receives as a result of the additional sunlight caused by the alteration. Hearing Transcript,
September 21, 1992, p. 142, 144, 169;
B. Condition 13
With regard to Condition 13, the appellants argue that the testimony of Dr. Kupa displays that the required plantings would shade the vegetation adjacent to the stream and thereby reduce its overall vitality as a wildlife habitat. Hearing Transcript,
September 21, 1992, p. 56.
In contrast, the DEM experts testified that as an alternative to requiring the appellants to move the streams back to their original locations and regrade and replant the entire wetland area, Condition 13 was established to provide "some minimum mitigative effort" along the relocated watercourse and was the minimum that the DEM could accept for mitigation in a compromise effort to resolve an old case. Id. at p. 38 and p. 44-45. In addition, Mr. Horbert opined that Condition 13 would create a further barrier preventing cattle from entering the stream and provide additional shading and habitat for wildlife.
C. Condition 17
The appellants believe that imposition of Condition 17, like the previous Conditions, exceeds the jurisdiction conferred on the director by the Legislature, and is in excess of the statutory authority of the agency. The appellants' expert, Dr. Kupa, testified that the northwest triangle offers a special kind of wetland habitat which is important to increasing the diversity of wildlife in the area. Hearing Transcript, September 21, 1992, p. 57. Dr. Kupa did admit, however, that he is not familiar with the site prior to the alterations. Id. p. 75.
The DEM, through its expert Mr. Horbert, stated that Condition 17 is necessary to provide additional naturally occurring habitat to mitigate against the effects of the clearing. Id. p. 21. Mr. Albro testified that Condition 17, like all of the other conditions, is required in an attempt to provide for some minimal mitigation for the previously unauthorized alterations without requiring full restoration. He explained that this mitigation is minimal because it does not restore the wetlands to their original condition prior to the alterations and does not regain the lost wildlife. Id. at p. 33, 35-38, 41, 48.
After hearing the testimony and reviewing the record before her, the hearing officer found: (a) that the applicants failed to prove that Conditions 11, 13, and 17 are not necessary for the protection of wetlands; (b) that Condition 17 is not in excess of the delegation of authority by the General Assembly to the DEM; (c) that the conditions are consistent with the public interest and public policy set forth in § 2-1-18 and § 2-1-19; and, (d) that the conditions are consistent with the purposes of the Freshwater Wetlands Act and comply with the Rules and Regulations governing the enforcement of the Act.
A trial judge's impressions as he or she observes a witness and listens to testimony are all important to the evidence sifting which precedes a determination of what to accept and what to disregard. Environmental Scientific Corporation, 621 A.2d at 206 (finding that credibility determinations are necessarily implicated in a hearing officer's decision where the officer hears testimony from experts on both sides). "Sitting as if at the mouth of a funnel, a hearing officer hears testimonial and documentary evidence from all affected parties . . . ." Id. at 207. "Just as the funnel narrows, the hearing officer analyzes the evidence, opinions, and concerns of which he or she has been made aware and issues a decision." Id. In that case, our Supreme Court criticized the DEM director for rejecting a hearing officer's recommendation because, as the director "sits at the narrowest point of the funnel, he or she is not privileged to hear or witness the broad spectrum of information that entered the widest end of the funnel" and that, ". . . the further away from the mouth of the funnel that an administrative official is when he or she evaluates the adjudicative process, the more deference should be owed the factfinder." Id. at 207-208. Thus, the Superior Court is confined to a determination of whether there is any legally competent evidence to support the agency's decision. Barrington School Committee v. Rhode Island State LaborRelations Board, 608 A.2d 1126, 1138 (R.I. 1987). If competent evidence exists in the record considered as a whole, the Court is required to uphold the agency's conclusions. Id.
In the instant case, this Court is satisfied that the hearing officer sifted the evidence, selected the facts which carried the greatest weight, and evaluated whether the credible evidence supported a finding that conformed with the department's regulations. The hearing officer accepted the opinions from the DEM's experts and rejected the formulations of the appellants' experts. This Court is satisfied further that the findings of the hearing officer are grounded in state law, regulations, and public policy, and that the final decision was not clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record.
3. Condemnation
Finally, in their brief, the appellants argue that because the DEM found no abridgment to the intent of the Act, imposition of the aforementioned Conditions is penal in nature and amounts to a condemnation of a portion of their property. The appellants allege that the DEM does not have the power of condemnation and that the director exceeded the director's statutory authority. Consequently, the appellants petition this Court to strike the offending Conditions. This argument was not included in the appellants' complaint and was not raised below.
Before addressing the condemnation argument, it must be pointed out that the DEM did not find that there was no abridgment of the Act. Specifically, the DEM found that "withspecial conditions, the project does not represent an abridgment of the Rhode Island Fresh Water Wetlands Act." (Emphasis added). The DEM then proceeded to specify the conditions which would bring the appellants' project within the requirements of the Act in order to avoid an abridgment. These Conditions are the very conditions that the appellants are now contesting.
The distinction between the exercise of police power and the power of eminent domain is the use to which the property is put and the degree of damage to the property owner. Annicelli v. Townof South Kingstown, 463 A.2d 133, 144 (R.I. 1983). Pecuniary loss or diminution in value is not controlling on the issue of confiscation because a property owner does not have a vested property right in maximizing the value of his property. Id.
Recently our Supreme Court addressed the condemnation issue when posed in the question, "[d]oes denial of an application to alter wetlands constitute a regulatory taking that requires just compensation?" Alegria v. Keeney, 687 A.2d 1249, 1250 (R.I. 1997). In that case, the plaintiff administratively appealed the denial of his application and then appealed the DEM ruling to the Superior Court. The Superior Court stated that the takings issue was not correctly before it and permitted the plaintiff to file an amended appeal seeking compensation. Alegria, 687 A.2d at 1251. It was only after the filing of the amended appeal that the Superior Court would address the condemnation issue.
In declaring the policy of the Wetlands Act, however, the Legislature expressly stated that restrictions in the use of wetlands is an exercise of police power. R.I.G.L. § 2-1-19. In Milardo v. Coastal Resources Management Council, 434 A.2d 266
(R.I. 1981), the Court upheld, as a proper exercise of police power, rejection by the Coastal Resources Management Council (CRMC) of the plaintiff's application for a permit. The Court noted that because the agency had "no statutory authority to compensate plaintiff, no purpose would have been served by introducing evidence to determine whether a factual underpinning could be established upon which a claim for inverse condemnation might be based. . . ."
Similarly, the takings issue in the instant case is not properly before this Court. In Milardo, the Court rejected, as a sweeping conclusion, the testimony of a real estate appraiser who stated that if the land was determined to be not buildable, it would have "no value whatsoever outside of the beauty in the eyes of the beholder." 434 A.2d at 268. In the instant matter, the record below is devoid of any issues relating to condemnation. Mr. Cohen, expert for the appellants, stated that imposition of the Conditions would result in plantings which would cover 8.5% of the total property and would combine for a loss of 23.5% of the grazing pasture. The implication is that the land has no other beneficial use; however, no other testimony was introduced on this matter, nor would its introduction have been appropriate as this was an administrative hearing. Section 2-1-24(b) of the Wetlands Act states:
 (b) "Whenever a landowner shall be denied approval to alter a wetland by the director . . . under subsection (a), the landowner may elect to have the state . . . acquire the land involved by petitioning to the superior court." § 2-1-24(b).
Thus, the Act specifically sets out a procedure whereby the appellants can petition this Court to obtain appropriate relief in the form of monetary compensation. Removal here of the Conditions, as requested by the appellants, is not a valid option contained in the Act or with respect to the subject facts.
After a review of the entire record, the Court finds that the decision of the hearing officer is supported by reliable, probative, and substantial evidence in the record. Substantial rights of the appellants have not been prejudiced. Accordingly, the appeal is denied and dismissed.