[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This is an inverse condemnation[1] action brought by Plaintiff Anthony Palazzolo (Palazzolo or Plaintiff), a Westerly property owner, against the Rhode Island Coastal Resources Management Council (CRMC). In his complaint, Palazzolo alleges that the CRMC's denial of his application to fill and develop approximately eighteen acres of salt marsh property constitutes a taking for which he is entitled to compensation under both the Federal and State Constitutions.[2]
 TRAVEL
This case is back before the Superior Court on remand from the Rhode Island Supreme Court. After a bench trial held over seven days in 1997, the Superior Court entered judgment for the State, holding, inter alia, that there was no taking as to Plaintiff Palazzolo because the regulations[3] relied on by the State to bar the two proposals submitted for agency approval were in effect prior to Plaintiff's ownership of the parcel in question. Accordingly, the Court reasoned that Plaintiff could not have had reasonable investment-backed expectations in light of regulations prohibiting developments which require filling of salt marsh. The Superior Court likewise found that the state's guarantee to permit the development of a single lot worth approximately $200,000 did not deny Plaintiff all beneficial use of his property. Moreover, the trial justice found that the development contemplated by Plaintiff would constitute a public nuisance, a fact which the court concluded would bar compensation to Plaintiff. Finally, the trial court found that the Plaintiff did not have any investment-backed expectations, relying on Alegria v. Keeney, 687 A.2d 1250
(R.I. 1997)[4] and applying a Penn Central[5]
analysis.
Palazzolo appealed the trial court's decision.[6]
The Rhode Island Supreme Court affirmed, holding that the appeal was not ripe for decision because Plaintiff had never properly submitted an application to CRMC for the development of his property. Therefore, the court reasoned, Plaintiff had never received a final decision regarding either the development which he wished to pursue or one with lesser environmental impact which would be better suited for the location. Palazzolo v.State, 746 A.2d 707, 714 (R.I. 2000).[7]
On writ of certiorari, the United States Supreme Court found the case ripe for decision, reversed the holding of the Rhode Island Supreme Court, and remanded the case for the purpose of a Penn Central analysis. Palazzolov. Rhode Island, 533 U.S. 606 (2001). The Rhode Island Supreme Court entered an Order, dated June 24, 2002, remanding the case to the Superior Court with express guidelines. By Administrative Order this case was specially assigned to this Associate Justice. After several continuances which were requested by both parties, additional evidence was taken over eleven days to augment the 1997 trial record. As mandated by the June 24, 2002 Order, evidence was taken for the purpose of determining "the claim of Anthony Palazzolo for monetary damages against the State of Rhode Island for an alleged regulatory taking of his property by analyzing his reasonable investment-backed expectations in accordance with the principle enunciated in [the PennCentral case]."
The analysis contained in this Court's decision will respond to each of the guideline requirements of the June 24, 2002 Order.[8]
 FACTUAL OVERVIEW
As developed by evidence received during both the first and the second trials,[9] the subject property (site) is located on the south side of Winnapaug Pond, a tidal, salt water pond. Although the breachway allowing salt water tidal flow to and from the pond has frequently been filled in and the breachway location has changed over time, there is substantial geologic evidence which shows this pond to have been tidal for more than 2000 years.[10] While the substantially developed land to the north of the pond is markedly higher than pond level, the entire southern perimeter of the pond consists of salt water marsh.[11] Even today it remains nearly devoid of development. It is within this area that Palazzolo first acquired a property interest through his long time friend, lawyer Natale Urso, in 1959.[12]
Access to the Palazzolo property is by means of traveling on Atlantic Avenue, a nearly straight, two-lane highway which parallels the ocean and beaches. Atlantic Avenue is several feet above high water, it being located on a sand spine or berm upland formed over centuries by storm wash. At times storm surge has carried substantial quantities of sand (overwash) over the sand berm on which Atlantic Avenue is located and deposited the sand on the north side of the road.[13]
The geological formations made over time thus permitted relatively easy development of the lots located immediately adjacent to Atlantic Avenue.
The eighteen (18) acres of land (74 lots) at issue are almost all near pond elevation and much of the site is subject to daily tidal inundation.[14] Immediately after Palazzolo's acquisition of a half interest in the site, six lots[15] were sold off. At least some of these lots were easily developed because of their location on upland close to Atlantic Avenue. As to the remainder of the site, the survey filed with the Court indicates that approximately one-half of the site is below mean high water (MHW).[16] Moreover, the vast majority of the site is not readily available for home construction, the soil surface being composed of Matunuck mucky peat between six to eighteen inches thick. Before any type of development can occur, that soil must be removed and as much as six feet of fill placed over much of the remainder of the site now owned by Palazzolo.[17] An exception is the upland area of glacial remains near the pond shoreline to which a gravel road extending from Atlantic Avenue was connected prior to Palazzolo's involvement with the site.
There is substantial development on the land located immediately to the west, east, and north of the pond. Although that development has in large part not involved filling of wetlands, there is no doubt that several houses at the eastern and western ends of the pond were built on fill placed over previously existing wetlands.[18] The houses located on fill at the eastern end of the pond were built on deposits derived from dredging and improvement of the breachway by governmental authority. Other lots to the immediate north of Atlantic Avenue have been filled to facilitate development. However, it is not at all clear that any substantial area of salt marsh has been filled here without state approval. On the other hand, substantial fill — mostly sand — has been deposited on the northern side of Atlantic Avenue by both mankind and the millennia of ocean storms.[19]
The site owned by Palazzolo is similar to all of the remaining 146 acres of salt marsh contiguous to the pond, almost all of which is on its south side. These marshes provide valuable habitat for wildlife including birds and fish.[20] With the exception of the two houses built on upland (glacial remnants) contained within or adjacent to the extensive salt marshes found on the south shore of the pond, there has been essentially no development within the salt marsh.[21]
The 446 acre Winnapaug Pond is a shallow,[22] tidal pond used for fishing, boating and shell fishing. Its size and shallow depth make it a particularly fragile ecosystem.[23] The adjacent salt marsh provides, inter alia, a valuable filtering system regarding water runoff containing pollutants and nitrogen from adjacent land.[24]
The ISDS[25] systems from the proposed subdivision would add significant nitrogen to the pond. While experts disagree on the precise amount of nitrogen removal the site is responsible for, filling of the Palazzolo site would result in 12% less salt marsh and a reduction of pollutant and nitrogen filtering by the pond's salt marsh ecosystem. The effect of the denigration of the natural purifying salt marsh is viewed by experts as significant.[26] Loss of the marsh filtering effect, together with the loss of wildlife habitat which would occur if Plaintiff's planned subdivision was constructed, was previously found by this Superior Court to constitute a nuisance.[27]
Moreover, there can be no doubt that the pond and its surroundings, particularly the undeveloped salt marsh, have an amenity value to both the land owners in the area as well as the entire vacation/recreation community in Westerly.[28] This Court likewise finds that the evidence is to the effect that not only has there never been a subdivision near Winnapaug Pond which rivals the scope of that proposed by Palazzolo, but none exists anywhere on the Rhode Island shore.[29] Additional facts will be supplied as necessary in the discussion that follows.
 LEGAL ANALYSIS
Prior to discussing Plaintiff's takings claim in the context of a Penn Central analysis, it is necessary to consider certain background legal principles which bear on the extent of plaintiff's property interest. SeeLucas v. South Carolina, 505 U.S. 1003, 1029-30 (1992). The State contends that this Court's conclusion following the initial trial to the affect that Plaintiff's proposed development would constitute a public nuisance, precludes a Plaintiff's verdict on his takings claim. Moreover, despite the fact that both parties substantially augmented the trial record in 2004 with evidence which spoke to the issues of public and private nuisance, the State claims that this Court's 1997 decision, as to the issue of nuisance, is law of the case and can not be disturbed. Plaintiff vigorously disagrees.
The State also contends that a strong Public Trust Doctrine in Rhode Island must result in a finding that the subject parcel is not capable of being developed economically. This is because, the State maintains, approximately one-half of Plaintiff's property lies below the mean high water mark and is, therefore, not Plaintiff's to develop, at least in contravention to the wishes of the state. Plaintiff disagrees, contending that the survey does not establish the mean high water mark with sufficient precision to allow this Court to accept the survey as establishing the mean high water mark for Plaintiff's property. Plaintiff also contends that Winnapaug Pond is not a tidal pond for purposes of the Public Trust Doctrine and, therefore, Plaintiff's property rights should not be limited by such doctrine.
 I. Public and Private Nuisance
A. Law of the Case and Res Judicata
The doctrine of law of the case provides "that ordinarily after a judge has decided an interlocutory matter in a pending suit, a second judge, confronted at a subsequent phase of the suit with the same question in the identical matter, should refrain from disturbing the first ruling." State v. Infantolino, 116 R.I. 303, 310,355 A.2d 722, 726 (1976). However, if a party introduces material that significantly expands the record, then a second judge would be warranted in revisiting the first judge's ruling. Id. at 311, 726. "When presented with an expanded record, it is within the trial justice's sound discretion whether to consider the issue." Goodman v.Turner, 512 A.2d 861, 864 (R.I. 1986). See also RhodeIsland Hosp. Trust Nat'l Bank v. Nat'l HealthFoundation, 119 R.I. 823, 384 A.2d 301 (1978). And a change in circumstances may be sufficient to override the "law of the case" doctrine. Kelley v. Cowesett HillsAssocs., 768 A.2d 425, 430-31, (R.I. 2001).
 "Although this law-of-the-case doctrine does not have the finality of res judicata, `it is one that generally ought to be adhered to for the principal reason that it is designed to promote the stability of decisions of judges of the same court and to avoid unseemly contests and differences that otherwise might arise among them to the detriment of public confidence in the judicial function.'" Richardson v. Smith, 691 A.2d 543, 546 (R.I. 1997) (quoting Salvadore v. Major Elec. Supply, Inc., 469 A.2d 353, 356 (R.I. 1983)).[30]
During the 1997 trial the State raised public nuisance as a defense, and this Superior Court rendered a finding on that issue. This Justice acknowledges that because the first trial justice ruled on the public nuisance issue, this Justice could exercise his discretion and refrain from disturbing the prior ruling.
Palazzolo contends that significant new evidence has been presented to this Court so as to justify reexamining the issue of nuisance. Given the expanded record developed during the second "trial", this Justice will not invoke the law of the case doctrine but rather will reconsider the State's claim of nuisance as a defense.
B. Public Nuisance
 "Actionable nuisances fall into two classifications, public and private. A private nuisance involves an interference with the use and enjoyment of land. It involves a material interference with the ordinary physical comfort or the reasonable use of one's property. Iafrate v. Ramsden, 96 R.I. 216, 221, 190 A.2d 473, 476 (1963). A public nuisance is an unreasonable interference with a right common to the general public: it is behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." Citizens for Preservation of Waterman Lake v. Davis, 420 A.2d 53, 59 (R.I. 1980).
See also Hydro-Manufacturing., Inc. v. Kayser-Roth Corp., 640 A.2d 950, 957
(R.I. 1994).
Claims may also be brought on the basis of anticipatory nuisance. SeeCommerce Oil Refining Corp. v. Miner, 281 F.2d 465, 474-75 (1st Cir. 1960); Berberian v. Avery, 99 R.I. 77, 81-82, 205 A.2d 579, 582 (1964);Seidner, Inc. v. Ralston Purina Co., 67 R.I. 436, 24 A.2d 902 (1942). Not frequently litigated in Rhode Island, anticipatory nuisance was discussed in greatest detail in the Seidner case. "It is well settled that a court of equity may enjoin a threatened or anticipated nuisance, public or private, where it clearly appears that a nuisance will necessarily result from the contemplated act or things which it is sought to enjoin." Id. at 450, 909 (quoting 7 A.L.R. 749). Nuisance must be "proved by clear and convincing evidence that such damage will be practically certain to result." Id. at 451, 909-10. See also Commerce Oil Refining Corp.,281 F.2d at 474-75; Berberian, 99 R.I. at 81-82, 205 A.2d at 582. The requirement is that substantial damage will be practically certain to result. Seidner, 67 R.I. at 451, 24 A.2d at 909.
In Lucas v. South Carolina, the United States Supreme Court observed that there can be no taking where a proposed use is prohibited ab initio
by nuisance law. 505 U.S. at 1029. The Court also stated that a nuisance analysis requires a review of "the degree of harm to public lands and resources, or adjacent private property, posed by claimant's proposed activities . . . the social value of the claimant's activities and their suitability to the locality in question. . . ." Id. at 1030-31. TheLucas Court left the nuisance determination to state law, but not before establishing public nuisance as a preclusive defense to takings claims.
In the case at bar, Palazzolo's proposed development has been shown to have significant and predictable negative effects on Winnapaug Pond and the adjacent salt water marsh. The State has presented evidence as to various effects that the development will have including increasing nitrogen levels in the pond, both by reason of the nitrogen produced by the attendant residential septic systems, and the reduced marsh area which actually filters and cleans runoff. This Court finds that the effects of increased nitrogen levels constitute a predictable (anticipatory) nuisance which would almost certainly result in an ecological disaster to the pond. Both water quality and wildlife habitat would be substantially harmed. Nor is the proposed high density subdivision suitable for the salt marsh environs presented here.
This Court agrees with the first trial justice. Because clear and convincing evidence demonstrates that Palazzolo's development would constitute a public nuisance, he had no right to develop the site as he has proposed.[31] Accordingly, the State's denial to permit such development cannot constitute a taking. See Lucas, 505 U.S. at 1029
(holding nuisance finding under state law precludes takings claim).
C. Private Nuisance
"A private nuisance involves an interference with the use and enjoyment of land. It involves a material interference with the ordinary physical comfort or the reasonable use of one's property." Citizens for Pres. ofWaterman Lake v. Davis, 420 A.2d 53, 59 (R.I. 1980) (citing Iafrate v.Ramsden, 96 R.I. 216, 221, 190 A.2d 473, 476 (1963)). "Historically the law of private nuisance has been applied to conflicts between neighboring, contemporaneous land uses." Hydro-Manufacturing, Inc. v.Kayser-Roth Corp., 640 A.2d 950, 957 (R.I. 1994) (citing PhiladelphiaElec. Co. v. Hercules, Inc., 762 F.2d 303, 314 n. 9 (3d Cir. 1985)). "Under Rhode Island law it is well settled that a cause of action for a private nuisance `arises from the unreasonable use of one's property that materially interferes with a neighbor's physical comfort or the neighbor's use of his real estate.'" Id. (citing Weida v. Ferry,493 A.2d 824, 826 (R.I. 1985)); see also Hennessey v. Pyne, 694 A.2d 691,695 (R.I. 1997). "The burden of proving a nuisance is upon the party alleging it . . . who must demonstrate the existence of the nuisance . . . and that injury has been caused by the nuisance complained of."Citizens for Pres. of Waterman Lake, 420 A.2d at 59 (internal citations omitted).
In this case no neighboring landowner has made a private nuisance claim. If built, Plaintiff's development would have a surface level as much as seven feet above current ground level and as a result, block all water views now enjoyed by land owners to the south of the parcel in question. Although Plaintiff's planned subdivision may be remarkably out of character with respect to its surroundings, blocking a neighbor's view is not ordinarily considered a nuisance which is actionable at law. Ordinarily, an abutting landowner has no right to light and air that would be available to him but for the presence of a man-made obstruction such as a fence. See Musumeci v. Leonardo, 77 R.I. 255, 259-60,75 A.2d 175, 177-78 (1950). Nor is there a right to a water view. "Distinguished from negligence liability, liability in nuisance is predicated upon unreasonable injury rather than unreasonable conduct."Wood v. Picillo, 443 A.2d 1244, 1247 (R.I. 1982). On the facts presented here it is difficult to conclude that the development would interfere with any neighbor's physical comfort or land use. Therefore, Plaintiff's development would not constitute a private nuisance.[32]
 II. Public Trust Doctrine Lucas v. South Carolina, 505 U.S. 1003 (1992) makes clear that, for purposes of takings analysis, the title one takes to property is subject to background principles of state law. Lucas states that the government need not compensate the property owner if the regulated or prohibited use was "not part of his title to begin with." Id at 1027. State nuisance doctrine has been discussed above and it would bar Plaintiff's takings claim in this Court's view.
A second significant issue is to what extent the Public Trust Doctrine would have limited the title originally acquired by Plaintiff and his predecessor in interest, Shore Gardens, Inc. (SGI). Succinctly stated, the State contends that because of the Public Trust Doctrine and trial evidence proving that one-half of the site is below mean high water, Plaintiff could not have expected to develop his subdivision absent the consent of the state.
Plaintiff counters by contending that the State's survey is erroneous, claiming that substantially more than one-half of the site is above the 1986 mean high water mark.[33] Moreover, Plaintiff now claims that because the pond is subject to periodic closing of its breachway, it is not truly a tidal pond and thus, is not subject to the Public Trust Doctrine.[34] Thirdly, Plaintiff contends that Winnapaug Pond and other similar coastal ponds are not subject to the Public Trust Doctrine.
After receiving voluminous evidence on the issue, this Court finds that Winnapaug Pond is a tidal body of water. This Court likewise finds that the survey filed with the Court (Ex. CCCCC) is accurate and establishes a mean high water line as of 1986, proving that almost exactly 50% of Plaintiff's property is below mean high water. Thus, the pond and Plaintiff's adjacent property are subject to the Public Trust Doctrine.
In Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), the United States Supreme Court expounded in great detail concerning the history and application of what is now commonly referred to as the Public Trust Doctrine.[35] The Court concluded in general that
 "Lands under tide waters are incapable of cultivation or improvement in the manner of lands above high water mark. They are of great value to the public for the purposes of commerce, navigation and fishery. Their improvement by individuals, when permitted, is incidental or subordinate to the public use and right. Therefore the title and the control of them are vested in the sovereign for the benefit of the whole people.
. . .
 The title and rights of riparian or littoral proprietors in the soil below high water mark, therefore, are governed by the laws of several States, subject to the rights granted to the United States by the Constitution." Id. at 57-8 (Emphasis added.)
Shively established beyond question a nationwide Public Trust Doctrine which is to be applied based upon state
law.
There can be no doubt that the doctrine remains viable law in Rhode Island. Not only was the Public Trust Doctrine incorporated into the Rhode Island Constitution, R.I. Const. art. 1, Section 17, but as recently stated by our Supreme Court, "[a]ny system of regulation of tidal land in Rhode Island must be viewed in the context of [the] ancient and still vital doctrine of . . . the public trust doctrine. . . ." Champlin'sRealty Assocs., L.P. v. Tillson, 823 A.2d 1162, 1165
(R.I. 2003) (quoting Town of Warren v.Thornton-Whitehouse, 740 A.2d 1255, 1259 (R.I. 1999)).
Restated, the Public Trust Doctrine dictates that, "the state holds title to all land below the high-water mark in a proprietary capacity for the benefit of the public." Greater Providence Chamber of Commerce v. RhodeIsland, 657 A.2d 1038, 1041 (R.I. 1995). "Such common law is in force in Rhode Island `except as it has been changed by local legislation or custom.'" Id. at 1042 (quoting City of Providence v. Comstock, 27 R.I. 537, 543,65 A. 307, 308 (1906)).
A limitation to the Public Trust Doctrine exists when there has been a legislative decree, such as when the legislature transfers property or grants rights to control or regulate property below mean high water to cities or municipalities. Thornton-Whitehouse,740 A.2d at 1259-60. The State may likewise cede its ownership interest while retaining its rights and powers under the public trust doctrine. Champlin's RealtyAssocs., L.P., 823 A.2d at 1167.
As to Winnapaug Pond in general and Plaintiff's property specifically, there has been no express legislative transfer of the state's public trust rights. Cf. Greater Providence Chamber of Commerce v.Rhode Island, 657 A.2d at 1040-41. Palazzolo has not shown any such legislative action in relation to the property in question. Nor has there been either express or implied state approval or acquiescence to the filling of tidal waters upon which the Plaintiff has relied to his detriment.[36] Palazzolo has not filled and improved his property with the permission or acquiescence of the State. Accordingly, this Court finds that as a result of Rhode Island's Public Trust Doctrine, neither Plaintiff nor SGI has ever had a right to fill or develop that portion of the site which is below mean high water. Thus, as against the State, Palazzolo has gained title and the corresponding property rights to only one-half of the parcel in question. Although the Public Trust Doctrine cannot be a total bar to recovery as to this takings claim, it substantially impacts Plaintiff's title to the parcel in question and has a direct relationship to Plaintiff's reasonable investment-backed expectations as will be discussed below.[37]
 III. Penn Central Analysis
This Court now turns to the focus of the Rhode Island Supreme Court's remand and the United States Supreme Court's mandate, to consider whether or not Plaintiff has proved a compensable taking under the three part analysis set forth in Penn Central Transportation Co.v. New York City, 438 U.S. 124 (1978). The factors which provide the framework for analysis under Penn Central are (1) the character of governmental action, (2) the economic impact of the action on the claimant, and (3) the extent to which the action interfered with the claimant's reasonable investment-backed expectations.[38]
This Court is mindful that the analysis requires an ad hoc consideration of a number of other relevant factors often unique to the case at hand, including the temporal relationship between Plaintiff's acquisition of title and the regulations giving rise to the takings claim.Palazzolo v. Rhode Island, 533 U.S. at 636 (O'Connor, J., concurring).
In conducting the takings analysis, this Court must focus on the "parcel as a whole." Penn Central,438 U.S. at 130-31. The concept of "parcel as a whole" is also referred to as the "denominator" question. SeeTahoe-Sierra Pres. Council v. Tahoe Reg'l PlanningAgency, 535 U.S. 302, 327 (2002). This Court finds that the relevant parcel or "denominator" consists of the property subject to the regulatory impact. See KeystoneBituminous Coal Assn. v. DeBenedictis, 480 U.S. 470, 496-99
(1987) (holding that restricting only portion of property not considered a taking); Rith Energy v. UnitedStates, 270 F.3d 1347, 1349 (Fed. Cir. 2001) (distinguishing Palazzolo and finding no categorical taking where 91% of property value lost due to regulation). "[L]and developed or sold before the regulatory environment existed should not be included in the denominator." Loveladies Harbor, Inc. v. UnitedStates, 28 F.3d 1171, 1181 (Fed. Cir. 1994); see alsoPalm Beach Isles Assocs. v. United States, 208 F.3d 1374,1380-81 (Fed. Cir. 2000) (affirming holding inLoveladies Harbor, Inc. as to denominator inquiry and expanding to include other factors).
This Justice finds that the denominator or "parcel as a whole" is that property in which Palazzolo invested that is subject to the regulations. Accordingly, it does not include the six lots conveyed at the direction of Urso.[39] Accordingly, this Court will exclude the six lots conveyed at the direction of Urso for purposes of the Penn Central takings analysis.[40] Although as noted by the prior trial justice, SGI did receive some economic benefit when the six parcels were sold, those lots are not part of the denominator because they are not and never were subject to the regulatory taking at issue. Nor did Palazzolo apparently ever have development plans for those six lots.
The test in a regulatory takings case is easily summarized: `"if regulation goes too far it will be recognized as a taking.'" Tahoe-Sierra Pres. Council,535 U.S. at 326 (quoting Justice Holmes in the landmark decision of Pennsylvania Coal Co. v. Mahon, 260 U.S. 393
(1922)). However, determining the relevant PennCentral, case specific factors can only be described as exceedingly difficult.
A. Character of Government Action
Only brief discussion need be undertaken regarding the character of the governmental action herein. This is clearly neither a categorical physical takings case nor a regulatory takings case in which a statutory scheme has taken all "economically beneficial use" of the subject property. Compare Lucas v. South Carolina,505 U.S. 1003, 1019 (1992). This case falls squarely within the type of partial regulatory takings inquiry discussed in Tahoe-Sierra Pres. Council, Inc.,535 U.S. at 322-23. "A government regulation . . . that bans certain private uses of a portion of an owner's property . . . does not constitute a categorical taking."Id. (citing Village of Euclid v. Ambler Realty Co.,272 U.S. 365 (1926).
Nor does Plaintiff suggest that the environmentally friendly regulatory scheme at issue fails to benefit society generally.[41] Rather, Palazzolo seeks to be compensated for his inability to develop his property as he now idealizes, arguing that the damage to his economic interests caused by the regulations should be borne by the taxpayers and not by him as an individual property owner.[42]
The regulatory scheme is not directed at Plaintiff in particular. It has an identical impact on all property owners of tidal salt marsh. It is all too obvious that government need not compensate a property owner each and every time it enacts regulations which are designed to promote the health, safety, and welfare of the people.[43]
In fact, the legitimacy of the regulatory scheme at issue here militates against a finding that a taking has occurred. See Alegria v. Keeney, 687 A.2d 1249, 1254
(R.I. 1997).
As recently observed by the United States Supreme Court in Lingle v. Chevron, U.S.A., Inc, "[t]he PennCentral inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." 544 U.S. ___,125 S. Ct. 2074, 2082 (2005). This Court now turns to that inquiry.
B. The Economic Impact on Plaintiff
Plaintiff asserts that he has lost a profit of over three (3) million dollars[44] as a result of the State's denial of his planned development.[45]
Palazzolo apparently concedes that applicable zoning regulations would prohibit the construction of the 74 lot subdivision concerning which a plat was originally approved by the Town of Westerly. Some sixteen years after filing this lawsuit he makes his compensation claim based upon two alternate premises.[46] First, he claims that he should be compensated based on a full build out of the site — a fifty lot subdivision.[47]
Alternatively, Palazzolo argues that if this Court finds that he is prohibited from developing one-half of his property because that area lies below the mean high water line, compensation should be based upon a his engineer's proposed 17 lot subdivision.[48]
Palazzolo's monetary claim is based upon the premise that he is entitled to be compensated based upon the highest and best use of his property. Because the property is zoned residential and the parcel has been approved for a residential subdivision, he contends that he is entitled to compensation for profits he would have likely realized had the property been allowed to be developed to its highest and best use, a high density, residential subdivision.[49] Plaintiff may be correct if a taking is proved. However, the formula for computing the correct amount of compensation in the event of a taking is not the same as the antecedent determination of whether or not a taking has been proven. See Tahoe-Sierra Pres. Council, 535 U.S. at 318-19
(contrasting First English Evangelical Lutheran Churchof Glendale v. County of Los Angeles, 482 U.S. 304
(1987) with Lucas).
An evidentiary battle between the parties' site engineering and appraisal experts consumed a substantial portion of the second trial. Plaintiff's engineer opined that in 1986 dollars, it would cost $460,709[50] to provide the infrastructure and site work necessary for a 17 home development.[51] Plaintiff's proof as to preparation of site work to accommodate a full build out of 50 homes was a cost of $1,000,547.[52] However, as Plaintiff's engineer candidly admitted, he has never been involved in a development located in a marsh. Moreover, the engineer's site design did not conform to town infrastructure design requirements.[53]
Additionally, in preparing cost estimates, he did not use the most accurate pricing information, probably resulting in an underestimation of costs.[54]
Of critical importance is the fact that the ISDS systems that Plaintiff's engineer planned to utilize were experimental in 1986 and would have required a variance from the Department of Environmental Management (DEM).[55] Given the ecologically sensitive nature of the site and extremely adverse reaction to Plaintiff's development proposals by various individuals and public groups,[56] the granting of a variance for the use of experimental waste treatment systems at the site seems a remote possibility at best. Moreover, Plaintiff's engineering proposal did not anticipate the need for and would not allow the installation of conventional ISDS systems as a back up, which this Court finds would have been required in the event that the experimental ISDS systems were allowed.[57]
The testimony of the State's engineering expert cast grave doubt on the viability of Plaintiff's alternative proposals. As already discussed, the site development cost figures determined by Plaintiff's engineer were not based upon standard pricing data for the year in question which is published for use in the State of Rhode Island.[58] More importantly, the State's engineer computed astronomical development costs based upon the realistic assumption that standard ISDS systems with conventional leach fields would be required on the site.[59] Taking grading for drainage into account, as well as the need for vertical separation between ground water level and the surface of topsoil which would cover leach fields, the site would have to be filled with suitable material in substantial depth. The State's expert opined that the fill would be a minimum of six and one-half feet near the pond to approximately seven and one-half feet on the side of the development nearest Atlantic Avenue.[60] Additionally, in order to stabilize the site, sheet steel pilings would have to be placed on three sides of the parcel. The State's expert concluded that for a 50 lot subdivision, development costs would be $3,893,750,[61] and for a 17 lot subdivision, development costs would be $1,300,956.[62]
The battle of trial experts likewise involved conflicting opinions by the real estate appraisers who were called by the parties.[63] This Court finds that the development costs and appraisal values presented by the State are the more reliable. The fatal flaw in the Plaintiff's profit estimate is principally due to the site preparation costs determined by Plaintiff's engineer. The Court finds computation of those development costs to be unreasonably low and unreliable. To the contrary, the State's estimate of profit after site development strikes the Court as having validity, given the methods used and the extreme difficulties involved in developing the site.
Furthermore, Plaintiff's appraiser failed to take into account the diminished amenity value resulting from the diminution of a portion of the pond's salt marsh because of this high density residential development.[64]
Common sense as well as the evidence adduced at trial necessarily leads to the conclusion that Plaintiff would benefit from an "average reciprocity of advantage"[65]
as a result of limited development of the parcel in question. The value of the undeveloped salt marsh figures into the value Plaintiff should realize from the sale of a single house lot. Thus, at least in a small way, Plaintiff benefits directly from the regulations which form the target of his complaint.
The State's evidence is to the effect that a development of 50 lots would have a value of $158,000,[66]
whereas a development of 17 lots would have a value of $8,000.[67] Even the State's figures do not factor in any consideration of the so-called amenity value of the pond setting with the intense development contemplated by Plaintiff and perhaps others. Thus, the State's figures relating to estimated profit may be optimistic. The ultimate conclusion is that Plaintiff will be better off financially by selling the site in its current undeveloped state, knowing that a single residence will be allowed to be built on the upland area near the pond shoreline.[68]
Moreover, although Plaintiff is entitled to compensation based upon the highest and best use of the subject property if there is a taking,[69] diminution of property value, standing alone can not establish a taking. See Tahoe-Sierra Pres. Council, 535 U.S. at 319
n. 15 (collecting cases). Rather, the initial inquiry is not the degree of compensation, but whether there is a taking. Determination of the takings issue depends in large part on Plaintiff's reasonable investment-backed expectations and whether or not the property owner has been unfairly economically impacted. However, "[p]ecuniary loss or diminution in value is not controlling on the issue of confiscation because a property owner does not have a vested property right in maximizing the value of his property." Alegria v.Keeney, 687 A.2d 1249, 1253 (R.I. 1997) (citing Anicelliv. Town of South Kingstown, 463 A.2d 133, 140 (R.I. 1983)).[70]
Based on the more reliable evidence presented at trial, this Court finds that, regardless of any diminution of parcel size available for development due to the Public Trust Doctrine, site development costs unique to the parcel in question would result in an economic loss to Plaintiff if he were to build either of the high density residential developments he has proposed. Thus, as to Palazzolo's claim, the regulations complained of do not have an adverse economic impact.
This Court now turns to the third prong of the PennCentral analysis, consideration of Plaintiff's reasonable, investment-backed expectations.
C. Plaintiff's Reasonable Investment-backed Expectations
"Investment-backed expectations, though important, are not talismatic under Penn Central." Palazzolo v. RhodeIsland, 533 U.S. at 634 (O'Connor, J., concurring). However, although due consideration is given to a number of other factors involved in this ad hoc Penn Central
analysis, the remand to this Court directs attention to this factor in particular.
Logic suggests that in evaluating Plaintiff's reasonable investment-backed expectations, this Court must start with Plaintiff's earliest interest in the site's development potential. Palazzolo testified that he developed an appreciation for the promising economic opportunities near the vicinity of Misquamiquit Beach from his youth. However, no other similar subdivision has apparently ever been proposed for the salt water marsh adjacent to Winnapaug Pond. Palazzolo, a businessman, but one with no prior experience in real estate development, acquired a 50% interest in the subject property in 1959 from the Ursos.[71] The property was almost immediately transferred to SGI of which Palazzolo became president. Of significance is the fact that the six prime lots on which houses could be easily built were immediately conveyed to other owners by SGI. At least four of these have been improved with the construction of homes.[72] In the words of Plaintiff, he acquired an interest in "the worst of them [lots], what's left."[73] Thus, even from the time of his initial investment, Palazzolo had doubts about the value of the remaining property. While Palazzolo hoped that some variation of the 74 lot subdivision would eventually be approved, the third prong of the PennCentral analysis — investment-backed expectations — clearly requires a determination of realisticallyachievable economic goals. This Court finds that Plaintiff's investment-backed expectations were not realistically achievable; accordingly he fails to satisfy the third prong of the Penn Central test.
The fact that the co-owner of SGI stock, an attorney with prior real estate experience, quickly sold his interest to Plaintiff is not without import. The obvious challenges to profitable development and the failure of any other property owner to develop any significant portion of the salt water marsh on the shore of Winnapaug Pond undoubtedly weighed heavily in Urso's practical decision to sell out to Palazzolo. Urso must have known that massive filling of the site was required and permission of the state would be needed for such filling. These problems were known, or reasonably should have been known, by Palazzolo as early as his initial investment and must be factored into any determination of "reasonable investment-backed expectations." As discussed above, Rhode Island's long held public policy reserving ownership of that property below the mean high water mark in the state for the benefit of all citizens is an ancient doctrine. See R.I. Const. art. I, Section17; Bailey v. Burges, 11 R.I. 330 (1876); see alsoShively v. Bowlby, 152 U.S. 1 (1894). Nor can there be any question as to its applicability to the facts of this case.[74]
Attorney Urso's knowledge of the Public Trust Doctrine may have been a motivating factor in his initially offering the investment opportunity to Palazzolo and, shortly thereafter, selling his entire interest in SGI to Plaintiff.[75] Bluntly put, it would appear that Urso simply wanted out of a bad investment concerning which the primary beneficial use (the six lots on upland) had already been realized. Constitutional takings law does not compensate bad business decisions. Nor is "pecuniary loss or diminution in value . . . controlling on the issue of confiscation because a property owner does not have a vested property right in maximizing the value of his property." Alegria v. Keeney, 687 A.2d at 1253.
The Order of the Rhode Island Supreme Court remanding this case directed this Court to specifically consider the teachings of Greater Providence Chamber of Commercev. Rhode Island, 657 A2d. 1038 (R.I. 1995).[76] In that declaratory judgment suit, our Supreme Court set forth specific guidance regarding the fee simple title of owners of filled property which are impacted by Rhode Island's strong Public Trust Doctrine. Although GreaterProvidence Chamber of Commerce involved title issues relating to improved properties bounded by a harbor line or grantees of Cove Lands in Providence, our Supreme Court endeavored to provide guidance to the courts regarding other parcels which are at least partially below mean high water and thus subject to the Public Trust Doctrine. The Court instructed as follows:
 "The test should be applied on a case-by-case basis according to the facts in each situation.
 A littoral owner who fills along his or her shore line, whether to a harbor line or otherwise, with the acquiescence or the express or implied approval of the state and improves upon the land in justifiable reliance on the approval, would be able to establish title to that land that is free and clear. The littoral owner may pursue a course of action seeking to convey the deed to that property to himself or herself and become owner in fee-simple absolute provided that the littoral owner has not created any interference with the public-trust rights of fishery, commerce, and navigation. Once the littoral owner acquires title to the land in this manner, the state cannot reacquire it on the strength of the public-trust doctrine alone. The state can, however, at any time, place restrictions on the filling in of shoreline provided it does so before a landowner has changed position in reliance on government permission." Greater Providence Chamber of Commerce,
657 A.2d at 1044.[77]
In the instant case the State has never expressly or impliedly consented to the filling of Plaintiff's parcel. All of Palazzolo's (and SGI's) requests for permits to do so in 1962, 1963, 1966, 1983 and 1985 were denied. Nor has Plaintiff made improvements to the parcel in reliance on state action or acquiescence. Plaintiff's title is clearly subject to the Public Trust Doctrine. Additionally, the State can prohibit filling because Plaintiff has not changed position in reliance on government permission. Plaintiff's reasonable investment-backed expectations must be measured against the premise that the one-half of Plaintiff's property which lies below mean high water can never be filled absent state approval.
The modest investment made by Plaintiff, the transfer of the prime lots almost coincidentally with Palazzolo's initial investment, his personal assessment of the value of the remaining lots, the obvious engineering difficulty in developing the site, existing state regulation over dredging and filling of tidal waters,[78]
the Public Trust Doctrine, a well publicized and growing nationwide movement toward the preservation of ecologically valuable sites during the last half of the twentieth century, and Urso's removal of himself as an owner suggests that Palazzolo's reasonable
investment-backed expectations were modest.[79]
 IV. No Taking
For the reasons stated above, background principles of state law limited the property rights acquired by Plaintiff and SGI, his predecessor in title. Plaintiff's proposed residential development of the site would constitute a public nuisance under Rhode Island law. Plaintiff's proposed use of the property was, accordingly, not a part of the "bundle of rights" acquired when he, and before him, SGI, obtained title to the subject parcel. Thus, the regulations complained of have not resulted in a taking under the Fifth Amendment. See Lucas v. South Carolina, 505 U.S. at 1027. Moreover, regardless of this Court's public nuisance finding, only one-half of the site is available for development by reason of the Public Trust Doctrine.
Plaintiff complains that to leave him with the development rights to a single lot would constitute mere "crumbs." However, the sale of the single, approved house lot would generate gross income to Palazzolo in the amount of approximately $200,000, a modest return on investment. Although he may view the return as mere token, "in at least some cases the landowner with 95% loss will . . . [receive no compensation]. . . ." Lucasv. South Carolina, 505 U.S. at 1019 n. 8.[80] The United States Supreme Court has "uniformily rejected the proposition that diminution in property value, standing alone, can establish a taking." Tahoe-Sierra Pres.Council, 535 U.S. at 538. (Citations and internal quotations omitted.) Moreover, the United States Supreme Court has already held that the regulatory scheme at issue "does not leave the property `economically idle.'"Palazzolo v. Rhode Island, 533 U.S. at 631 (citingLucas, 505 U.S. at 1019).
Regardless of any takings analysis, the more reliable evidence is to the effect that Plaintiff's proposed developments will not be profit producing. He is economically better off with a single lot for which there is little development cost. Thus, under the unique case-specific facts presented here, the economic impact of the regulations complained of do not adversely affect Plaintiff.
This Court's finding of little or no adverse economic impact is consistent with a realistic appraisal of Plaintiff's reasonable investment-backed expectations. For the reasons stated above, despite wishful thinking on Palazzolo's part,[81] he paid a modest sum to invest in a proposed subdivision that he must have known from the outset was problematic at best. Under the facts and circumstances unique to this case, Palazzolo could have had little or no reasonable expectation to develop the parcel as he has now proposed. Constitutional law does not require the state to guarantee a bad investment.
 CONCLUSION
In sum, Plaintiff has failed to prove by a preponderance of the evidence that there has been a regulatory taking of his property.[82] Moreover, because the development proposed by Plaintiff would constitute a public nuisance, his title did not include a property right to develop the parcel as he proposed. This Court finds for Defendant. Counsel for Defendant shall prepare a form of judgment consistent with this decision.
[1] "`Inverse condemnation' is a term used to describe a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." E J, Inc. v.Redevelopment Agency of Woonsocket, 122 R.I. 288, 290
n. 1, 405 A.2d 1187, 1189 n. 1 (1979) (citing Fergusonv. Keene, 108 N.H. 409, 410, 238 A.2d 1, 2 (1968)). "The inverse-condemnation cause of action provides landowners with a means of seeking redress for governmental intrusions. . . ." Harris v. Town of Lincoln, 668 A.2d 321,327 (R.I. 1995).
[2] In the 1960s, Palazzolo sought permission from the state to dredge Winnapaug Pond and place the dredge materials on his site. His request was denied. Palazzolo's 1983 incomplete application to the CMRC sought only permission to place substantial fill on the site, including areas below mean high water (MHW). At the CMRC hearing on the application, Palazzolo was not clear on his development plans. When asked his plan for development he replied, "I've spent twenty years trying to get to the first stage, meaning the filling of the area, and I haven't given serious thought to the second stage." Trial 1 (T1), p. 148. In 1985 Palazzolo applied to place fill on the site for the purpose of constructing a beach facility. The date on which the CMRC denied that application, March 3, 1986, serves as the date on which Palazzolo claims his property was taken. See Ex. E, p. 2.
[3] In 1976, the Coastal Resources Management Council adopted the Coastal Resources Management Plan which prohibited the filling of coastal wetlands without a special exception. These regulations were promulgated under the authority given the CRMC by legislation enacted in 1971, G.L. §§ 46-23-1 et seq. The CRMC has refused to grant Palazzolo an exception to enable substantial development of the site.
[4] The 1997 trial court likewise found that the Plaintiff was procedurally barred from recovery because he had failed to pursue appeals regarding two adverse decisions regarding earlier applications made to CRMC.
[5] Penn Central Transportation Co. v. New York City,438 U.S. 104 (1978) [hereinafter Penn Central].
[6] A succinct history of this litigation up to that point can be found in the opinion of the Rhode Island Supreme Court. Palazzolo v. Rhode Island, 746 A.2d 707
(R.I. 2000).
[7] The Rhode Island Supreme Court also considered the merits of Palazzolo's claims, finding that he had not been deprived of all beneficial use of his property.
[8] Guideline 3 required a tidal survey to be completed and filed with the Court prior to the second trial. Such a survey was completed; it was actually filed with the Court on the second day of that proceeding. See Ex. JJJ; Ex. CCCCC.
[9] The taking of evidence in 2004 by this Court was not technically a second trial but only an opportunity for the parties to offer evidence in support of the purposes announced in the remand. For simplicity, the process of taking an additional eleven (11) days of evidence will be termed a trial. The transcript of the proceedings held in April and May 2004 will be identified as T2D. The transcript of the continuation of the trial in June 2004 will be identified as T2 followed by date(s).
[10] A map from 1741 suggests that what is now named Winnapaug Pond was tidal and had an open breachway. Ex. EEEE. Even Plaintiff's expert hydrologist opines that the pond has had a man made or mankind enhanced breachway since about 1820. T2D, p. 219. Severe storms such as the 1938 and 1954 hurricanes have opened new breachways from time to time. T2D, pp. 217, 335, 392.
[11] Plaintiff's counsel stipulated that this property was "intertidal salt marsh." T1, p. 511. A similar conclusion can be based upon the presence of spartina alterniflora throughout the site. See e.g., Ex. FFFF. Plaintiff now contends that, but for artificially constructed mosquito control ditches, the property in question would be measurably higher and not nearly as subject to daily tidal undulations. This Court finds that the Plaintiff has failed to prevail as to that issue. Mosquito ditching at the site began as early as 1934. Some re-cutting and ditch cleaning was performed as recently as 1960-61. Exs. 32, 93.
[12] T2D, pp. 52-54, 93. Palazzolo actually acquired an undivided one-half interests in the parcels.
[13] T2D, p. 259.
[14] Some of the lots are actually under the pond. T2D, p. 90.
[15] T1, p. 582.
[16] Exs. 28, CCCCCC, and JJJ. This Court is mindful that Plaintiff contends that, but for artificially constructed mosquito control ditches, the property in question would be measurably higher and not nearly as subject to daily tidal undulations. This Court finds that the Plaintiff has failed to prevail as to this issue and accepts the survey filed with the Court as substantial scientific evidence as to the location of the mean high water (MHW) mark in 1986.
[17] T2D, pp. 316-17.
[18] It appears that state permission to fill tidal salt marsh has been required since long before Plaintiff acquired a property interest in the parcel in question. T2D, pp. 144-49. See applications for assent by State Board of Harbor Commission; Exs. DDDDD — PPPPP.
[19] Plaintiff's testimony on this point is contrary. See T2D, pp. 127-28, 140, 142-46, 184. Exs. KKK and LLL.
[20] T2D, pp. 417-18.
[21] One of the sites was filled with permission of the state. T2D, pp. 141-150. See also T1, p. 98.
[22] Pond depth averages just less than five feet. Ex. 50.
[23] For example, aquaculture is encouraged by state authorities because of "deterioration" of pond water quality which does not allow for "successful (natural) reproduction" of clams. Ex. 33.
[24] See e.g., T1, p. 234.
[25] ISDS is the common acronym for individual sewerage disposal system.
[26] T1, pp. 225, 502. A build out will result in a "possible catastrophic response" in the pond. T2D, p. 639. See also Ex. 30. Substantial and conflicting evidence was presented at the second trial regarding the direction of septic system discharge. This Court finds that the State's evidence in this regard more persuasive. Septic discharge from any development on the site would flow into Winnapaug Pond. T2D, pp. 647, 772.
[27] Accord, Machipongo Land Coal Co. v.Pennsylvania, 799 A.2d 751 (Pa. 2002) (holding harm to aquatic habitat alone sufficient to support nuisance finding).
[28] See generally T2, June 3 and 4, pp. 180-88.
[29] T1, pp. 317-18. Because of current building restrictions in flood plain areas such as this site, each residence would be built on pilings. The first floor of each house would be required to be approximately twenty (20) feet above ground level. Palazzolo's early proposal was inspired by lagoon-style developments which he had seen in Florida. This Court finds that it would be unrealistic to assume regulatory approval of a similar Florida-style development on Winnapaug Pond.
[30] Law of the case can be distinguished from claim preclusion, or res judicata. Res judicata bars claims or defenses that were raised or could have been raised at trial from being re-litigated once they have already been adjudicated by a court. Town of Richmond v.Wawaloam Reservation, Inc., 850 A2d 924, 932 (R.I. 2004). "Res judicata operates as an absolute bar to a cause of action [when] there exists `(1) identity of parties, (2) identity of issues and (3) finality of judgment.'" Id. (quoting Rhode Island Student LoanAuthority v. NELS, Inc., 600 A.2d 717, 720 (R.I. 1991)). Res judicata has been held to bar re-litigation of unappealed decisions, even decisions of administrative agencies or boards. Id. at 932-33 (citingDep't of Corrections v. Tucker, 657 A.2d 546 (R.I. 1995) and Town of Lincoln v. Cournoyer, 118 R.I. 644, 375 A.2d 410
(1977)). "Furthermore, a plaintiff . . . can invoke res judicata to preclude the defendant from asserting defenses that were raised or that could have been raised in the first proceeding." Id. at 932.
[31] Plaintiff contends that the state's regulations which deny filling of salt marsh without special exception go too far. Although Plaintiff readily concedes the unique value and limited acreage of salt water marsh, he claims that the "regulation goes beyond that permitted by common nuisance." Plaintiff's Post-Trial Statement of Proposed Findings of Fact and Conclusions of Law, p. 77. Plaintiff, however, has not been deprived of all beneficial use of his property and will actually benefit from the regulations at issue. See page 24, infra.
[32] One of the few private nuisances cases reported is Dowdell v. Bloomquist, 847 A.2d 827 (R.I. 2004). That case involved the interpretation of G.L. § 34-10-20
which provides that a "spite fence" constitutes a private nuisance. The case at bar involves neither a fence nor malicious intent by the Plaintiff.
[33] It is agreed that any taking would involve a determination of property rights as of March 3, 1986, the date the state denied approval of Plaintiff's proposal.
[34] At the 1997 trial Plaintiff's counsel declared: "We are all clear that . . . [Palazzolo] owns [the property] . . . subject to the public trust doctrine. . . ." T1, p. 227. "I . . . stipulate to the fact that this is an intertidal salt-marsh." T1, p. 511. An attorney's admission in open court binds his client.Cohen v. Goldman, 132 A.2d 414, 416 (R.I. 1957).
[35] Even before Shively, the Rhode Island Supreme Court recognized the public trust doctrine. See Bailey v. Burges,11 R.I. 330, 331 (1876).
[36] In Greater Providence Chamber of Commerce,
landowners who filled along the shore line with acquiescence or express or implied approval of the State and then improved upon that land in reliance on the state's approval were able to establish free and clear title. Those are not the facts in the case before this Court. The state has in no way expressly or impliedly granted permission for filling. Nor has Palazzolo improved the property in reliance on such state approval.
[37] As an analogue to the title limitations placed on the subject parcel by the Public Trust Doctrine, the State argues that state statutes and regulations which predate Plaintiff's acquisition constitute an independent background principle which would partially bar Plaintiff's recovery under a takings theory. See State's Substitute Post-Trial Memorandum at 36, 57-60. Because of the strong Public Trust Doctrine in Rhode Island and its obvious application to the property at issue, this Court finds it unnecessary to delve into this alternative partial defense. The body of state law to which the State refers does impact Plaintiff's reasonable investment-backed expectations as will be discussed below.
[38] As observed recently by the United States Supreme Court while citing to its decision in Palazzolo, "(t)hePenn Central factors — though each has given rise to vexing subsidiary questions — have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings orLucas rules." Lingle v. Chevron, U.S.A., Inc.,
544 U.S. ___, 125 S. Ct. 2074, 2082 (2005).
[39] The evidence is to the effect that all such sales were arranged by Urso and not Palazzolo. T2D, p. 93.
[40] This conclusion is in apparent conflict with that of the first trial justice. Palazzolo v. CoastalResources Mgmt. Council, No. 88-0297, slip op. at 12 (R.I. Super. Oct. 24, 1997).
[41] In a takings case it is "assume[d] that the underlying governmental action was lawful. . . ." RithEnergy, Inc. v. United States, 270 F.3d 1347, 1352
(Fed. Cir. 2001). As the State has argued throughout this litigation, Palazzolo's claim for damages is in part based upon the societal values placed on the protection of salt marsh and its environs as reflected by legislation and attendant regulations. While recognizing how such regulation may enhance his property interests as well as the common good, Plaintiff contends that the burden of such regulation falls too harshly on him. In this regard, Palazzolo is of similar mind to the property owner in Alegria v. Keeney, 687 A2d. 1249, 1254 (R.I. 1997).
[42] As restated in Tahoe-Sierra Pres. Council, "the Takings Clause was `designed to bar Government from forcing some people alone to bear burdens which, in all fairness and justice, should be borne by the public as a whole.'" 535 U.S. at 21 (citing Armstrong v. UnitedStates, 364 U.S. 40, 49 (1960)).
[43] "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Palazzolo v. Rhode Island, 533 U.S. at 627
(quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. at 413).
[44] On appeal following the initial trial in 1997, our Supreme Court characterized this profit figure as "speculative" and "unrealistically optimistic."Palazzolo v. Rhode Island, 746 A.2d 707, 715 (R.I. 2000). The additional evidence taken in 2004 more than suggests that Plaintiff's estimate of lost profit is unreliable.
[45] Ex. 79. Palazzolo's development plan as revealed at trial did not crystallize until long after he filed the instant lawsuit. See footnote 2, supra.
[46] Actually, Plaintiff has recently offered three development proposals. This Court has held that the proposal based upon a MHW of 1.45 is untenable. See footnote 48, infra.
[47] See Exs. 73 and ZZZZZ. In order to comply with municipal code restrictions, certain lots delineated on the town approved subdivision need to be combined for the purpose of a single residence. If the entire site could be developed, Plaintiff's engineer concluded that 50 homes could be built. If the State's survey showing that only 50% of the site was above MHW is accepted, only 17 homes could be built.
[48] Exs. 73 and AAAAAA. Neither of these proposed development configurations was ever submitted for CRMC approval. A third proposal for a 35 lot subdivision was premised upon a MHW of 1.45 above NGVD. National Geodetic Vertical Datum (NGVD) is a universally accepted reference point of mean sea level from which local MHW is measured. The computation of 1.45 above NGVD has been determined to be inaccurate by the expert who preliminarily made the computation. This Court has previously found no validity to this MHW computation.
[49] This assertion is based in large part on the testimony of Plaintiff's economist.
[50] All cost, development, and profit figures were corrected to 1986 dollars.
[51] T2, June 1 and 2, p. 67.
[52] T2, June 1 and 2, p. 68.
[53] Ex. 73; T2, June 3 and 4, pp. 110-11.
[54] Exs. WWWWW and VVVVV; T2, June 1 and 2, pp. 99-100.
[55] The system at issue, a bottomless sand filter, was not in use in Rhode Island until 1999. T2, June 3 and 4, pp. 82-3. An ISDS system similar to the bottomless sand filter was available in 1986. Known as the Ruck system, it nevertheless required a conventional leach field. Thus, the site preparation cost savings that would be realized through the use of a bottomless sand filter system would not be realized with a Ruck system.
[56] See e.g., Ex. VVV.
[57] According to the testimony of the State's engineering expert which this Court accepts as accurate, state regulations in effect in 1986 would have required that a developer who obtained approval for an ISDS system deemed to be experimental, make provision for the installation of a conventional system in the event that the experimental system failed. T2, June 1 and 2, pp. 135-39.
[58] T2, June 3 and 4, p. 71.
[59] Ex. EEEEEE.
[60] T2, June 3 and 4, pp. 74-5.
[61] T2, June 3 and 4 p. 103.
[62] T2, June 3 and 4, p. 105.
[63] Plaintiff objected to the testimony by the State's appraiser during the second trial based upon an alleged discovery violation. This Court finds that the discovery violation, if any, was minor in nature and did not prejudice Plaintiff. The testimony of Thomas Andolfo was highly probative and, in the opinion of this Court, fair and reasonable, having been based upon a realistic approach to conflicting evidence. Accordingly, this Court considered his testimony which was given at both the first and second trials. Plaintiff's motion to exclude the testimony of Andolfo at the second trial is denied.
[64] Even Plaintiff's real estate expert conceded that development of the salt marsh in its entirety would result in a glut of house lots and a collapse of the value of Plaintiff's property. Neither real estate appraiser who testified could quantify the benefit or loss attributable to low density or saturation density housing developments along the south shore of Winnapaug Pond.
[65] Coined by Justice Holmes in Pennsylvania Coal Co. v.Mahon, 260 U.S. 393 (1922), the term conveys the often valid premise that regulation can benefit even those whose property rights are curtailed by the regulation. See e.g., Euclid v.Amber Realty, 272 U.S. 365, 391-95 (1926).
[66] T2, June 9, p. 134. This plan ignores Public Trust Doctrine limitations.
[67] T2, June 9, p. 135.
[68] At the second trial the after regulation value of this single lot was said to be $154,000, T2, June 9, p. 137. At the first trial, the after regulation value was considered to be approximately $200,000.
[69] Plaintiff's economist opined that Plaintiff's actual $47,000 invested or spent on the property between 1959 and 1986 would equate to $119,000 in 1986 dollars after correcting for inflation. Assuming that a 12% rate of return was a reasonable expectation in the real estate field, he opined that Plaintiff would have a reasonable expectation to having parlayed his investment into $1,000,000. T2, June 1 and 2, p. 226. This Court finds that although the economic theory relied upon by the economist may be sound, it can not be applied to the proper regulatory takings analysis here. Average returns for real estate investment do not directly factor into the determination of whether or not there has been a taking under Penn Central. Cf. Florida Rock Indust. v.United States, 45 Fed. Cl. 21 (1999).
[70] The United States Supreme Court has already affirmed the Rhode Island Supreme Court's conclusion that Plaintiff has not been "deprived of all economic use of his property because the value of the upland portions is substantial." Palazzolo v. Rhode Island,533 U.S. at 616.
[71] Palazzolo's fellow stock owners were Natale Urso and his wife, Elizabeth. For simplicity this Court refers to Plaintiff's former investment partner as Natale Urso, the individual with whom Palazzolo had his business dealings.
[72] T1, pp. 53, 84-85; T2D, p. 93.
[73] T2D, p. 94. In Plaintiff's Response to Defendant's Substitute Proposed Findings of Fact and Conclusions of Law and Substitute Post-Trial Memorandum, filed months after the delivery of the second trial transcripts, Plaintiff claims that the stenographer erroneously reported the word "worst" instead of "rest" in referring to the lots in which he acquired an interest in 1959. This Court accepts the trial record as filed. However, as a practical matter Palazzolo's word choice is of little consequence in light of the totality of the circumstances. Palazzolo clearly invested in the worst of the lots because they, unlike the six which were conveyed out at the direction of Urso, were not readily capable of development.
[74] Not only does the Public Trust Doctrine ban the filling of property below MHW absent consent of the state, but since long before Palazzolo acquired an ownership interest in the site, state law required an agency's approval. See G.L. ch. 118, §§ 3-6, 10-12, 14 (1896).
[75] Palazzolo was frequently reminded of the public title to property below mean high water as early as his 1962 application on which was preprinted an acknowledgement that the request involved work within the "public tide waters of the state." Ex. M. See also Exs. MMM and OOO.
[76] Order, guideline 2.
[77] Littoral means "[o]f or relating to the coast or shore of an ocean, sea, or lake." Black's LawDictionary, p. 945 (7th Ed. 1999).
[78] Yet another factor to be considered is any regulation of the property at the time of Palazzolo's purchase. While the current regulatory scheme which gave birth to CRMC became effective in 1971, Rhode Island law regulated tidewaters and the filling of nearby flats as early as 1876. See G.L. ch. 118, §§ 3-6, 10-12, 14 (1896). Palazzolo clearly had knowledge of these regulations from the express notice printed on the forms which he used for multiple applications to the Department of Harbors and Rivers for development of the site as early as 1962.
[79] The Rhode Island Supreme Court previously found that because Palazzolo was not the owner of the parcel in question until well after the CRMC regulations went into effect, he had no right to claim a taking. While this part of our high court's decision was reversed by the United States Supreme Court, the timing of a claimant's property interest is a factor which can and should be considered in the Penn Central analysis. SeePalazzolo v. Rhode Island, 533 U.S. at 633 (O'Connor, J., concurring).
[80] Our high court has recognized that even a "negative return on plaintiff's initial investment cannot be characterized as noneconomic for purposes of takings analysis." Alegria v. Keeney, 687 A.2d at 1253.
[81] In its Reply to Palazzolo's Post-trial Memorandum, the State strenuously argues that Palazzolo's reasonable investment-backed expectations have to be analyzed in light of other similarly situated (tidal marsh land) property owners who may have attempted similar developments for their property. While this may be a factor to be weighed, there is no evidence that any other similarly situated land owner had proposed a similar development. And, as Palazzolo has repeatedly pointed out, he (or SGI) has the only approved subdivision on the south shore of Winnapaug Pond. Accordingly, this argument of the State has little force. See e.g., T2D, pp. 471-72.
[82] The evidentiary standard to establish a takings claim is preponderance of the evidence. Palm Beach IslesAssocs. V. United States, 58 Fed Cl. 657, 665 (2003) (collecting cases).